MARCUS MALLORY v. LOUISIANA PURE ICE & SUPPLY COMPANY, Appellant, and THOMAS J. HUMPHREYS, Appellant.—6 S. W. (2d) 617.

Court en Banc, May 18, 1928.

96

98

*Hostetter & Haley* and *May & May* for appellant Louisiana Pure Ice & Supply Company.

*A. J. Murphy* and *Ras Pearson* for appellant Humphries.

*Rendlen & White* and *Fred Wilkins* for respondent.

LINDSAY, C.—This action was brought by respondent in the Circuit Court of Pike County against Louisiana Pure Ice & Supply Company, and Thomas J. Humphries, on account of personal injuries sustained by respondent on March 4, 1924, when a wall of a brick building, near which he was at work, fell upon him. The venue was changed to Marion County, and respondent had a verdict for $8000, and the defendants in the suit separately appealed from the judgment entered. These separate appeals were heard and submitted together, and will be considered together here.

The Louisiana Pure Ice & Supply Company, hereafter called the Ice Company, owned and operated in the city of Louisiana a plant for the manufacture and sale of ice, and for cold storage purposes. About the first of January, 1924, the Ice Company began preparing to enlarge its plant by the erection of an additional building, immediately along the west wall of its existing building. The purpose was to do this without disturbance of the existing building, or of the business therein carried on, during the period of construction; and that afterward, when the new addition should be completed, the west wall of the existing building would be taken out.

On February 28, 1924, the appellant Humphries became the general contractor for the erection of the new structure. The Ice Company had procured Mr. Frankel, an architect of East St. Louis, to prepare plans. He inspected the plant and site of the proposed addition, and prepared plans and made blue prints. The Ice Company also employed Mr. Ralph Stewart of Louisiana, an architect and builder, to prepare and complete the specifications. Pending the making of the contract between the Ice Company and Humphries, and in anticipation of the construction work to be done, the Ice Company, through its manager, Mr. Rogers, procured one Goodman to excavate and haul away the earth on the lot immediately adjoining the old building, and upon which the new structure was to be built. The plaintiff was employed by Goodman, who began excavating before Humphries became general contractor, but the injury occurred to plaintiff after Humphries became general contractor. Mr. Stewart was engaged by the Ice Company as its superintendent, to see that all work was done according to the plans and specifications. The west wall of the old building (the wall which fell) was of brick, and nine inches thick, and stood upward about fourteen feet above the level of the concrete floor of the old building. It rested upon a stone foundation, about twelve inches wide, which extended about three feet below the ground level. This west wall was about thirty feet in length, and with its foundation was estimated to weigh sixty tons. The east wall of the new building was to be located immediately west of and against the west wall of the old

building. The plans and specifications did not specifically so state, and did not specifically refer to the old building; but, they were such that the foundation of the wall of the new building was to extend to a distance of two feet or more below the bottom of the foundation of the west wall of the old building, and was to extend laterally a distance of six inches underneath the foundation of .the old wall, so as to give the required footing for the new wall, and excavation had to be made accordingly. This was fully understood by the contractor. This lateral excavation was not done a section at a time, but was made underneath and along the side of the wall continuously and without shoring, or in any way supporting the old wall, and while being so done the old wall suddenly collapsed, and the respondent, who was employed as a laborer in the work of excavation, was caught by the falling wall, and seriously injured. The negligence alleged against the defendants was the making of this excavation, undermining the foundation of the old wall, alleged to be dangerous as done, without taking any steps to secure, meanwhile, the stability and preservation of that wall.

At the close of the plaintiff's evidence, each of the defendants asked a peremptory instruction, which was refused. The defendants introduced no evidence. Each of the appellants here assigns error in the refusal of the court to sustain the demurrer to the evidence, and the action of the court in that regard is the chief matter urged for consideration in their several briefs.

The main contention of appellant Humphries is, that Goodman was the person responsible; that he was an independent contractor for the doing of all of the digging and excavating called for by the plans and specifications, and that the court ought so to have declared as a matter of law. The chief contention of the Ice Company is, that appellant Humphries was an independent contractor for the doing of the whole of the work, and was solely liable for any negligence; and related thereto, the other contention, that the work was not inherently dangerous, and became so only by reason of the negligence of the contractor, in the manner of its doing. Goodman was not made a party to the suit.

It is not claimed on behalf of either of appellants that the wall fell because of any infirmity in the wall itself, or that its fall was caused otherwise than from undermining its foundation, nor is it urged that it was not negligence to remove the earth from underneath the wall for its entire length, as was done. The testimony was that the safest way was to dig out the earth, part at a time, in sections, and fill the spaces made with stone or cement, thus giving the overlying wall the necessary support. While the answers pleaded contributory negligence on the part of the plaintiff, there is no such claim urged on appeal.

The claim of appellant Humphries, that Goodman was an independent contractor for the Ice Company, to do all the necessary excavating in his own way, and that he was such at the time of respondent's injury; and the claim of the Ice Company that Humphries was an independent contractor to do all the work, including the excavating, at the time the wall fell, require somewhat extended notice of the evidence, since the evidence is concerned not only with what was done by the Ice Company, and what Goodman undertook to do, and what Humphries undertook to do, but that involves also, in a way, the question whether Humphries assumed and took over the duty and responsibility of Goodman.

The testimony of Goodman, and other testimony as well, shows that before the Ice Company and Humphries made their contract, Mr. Rogers, the Ice Company's manager, made an agreement with Goodman, whereby the latter was to excavate and remove the earth required to be taken out for the purposes of the contemplated building. There was no written contract between Goodman and the Ice Company. Goodman testified that Mr. Rogers called upon him and arranged for him to dig the dirt and excavate the basement and furnish the gravel, but that he did not at that time see any plans for the work; that this was in the latter part of January or the first of February; that Rogers told him about how deep the excavation would have to go, and estimated that the amount would be about 200 cubic yards; and Goodman says he agreed to take all the dirt out at sixty-five cent per cubic yard, but that he did not agree to take care of the wall that fell; that Rogers said he would take care of that; that Rogers said the excavating would not be deep, and that after the excavating was done, he would have men put in the concrete so as to protect all the way through. After Goodman began excavating, Mr. Stewart, who was engaged by the Ice Company to superintend the construction of the building, set stakes and gave directions to Goodman as to the place and depth of the excavation. In that manner, Goodman was proceeding with the work of excavation.

Meantime, the plans and specifications for the building were completed, and the Ice Company and Humphries entered into a written contract. The contract between Humphries and the Ice Company was executed on February 28, 1924, and under it Humphries agreed to furnish all the labor and materials necessary for the erection of the building, and Mr. Stewart was named therein as the supervising architect. The plans and specifications, referred to in the contract, contained the following clause: "Excavations and Foundations: The owner will do all excavating and will furnish foundations complete, ready for the brick work and superstructure." On behalf of defendant Ice Company, during cross-examination, there was introduced in evidence as an exhibit an itemized estimate made on February 20, 1924, by Humphries, showing the amount and cost of items of labor

and materials required for the erection of the building. One item of this was: "Excavation, $400." The total of the estimate was $40,050, which was the sum agreed to be paid to Humphries by the Ice Company under the contract of February 28, 1924. This itemized statement was referred to in the contract, and as being "attached" thereto. Humphries testified that it was understood between him and Rogers, the manager of the Ice Company, that the cost of excavation and removal of the earth should be deducted from the total contract price. Humphries in his deposition, read in evidence by the plaintiff, in the course of his examination, said: "I never relieved the Ice Company of any obligation that I know of. I assumed that there was a certain amount of excavating and I gave them a price on it, my bid including the excavating. After I got ahold of the job and the contract was awarded me, I never stopped the system that was being used." Stewart testified: "It was agreed that Mr. Goodman should complete the excavating at the price agreed on and that the amount should be deducted from the forty thousand dollars. . . . When I was there March 3rd, about four o'clock, partly to see that Goodman was doing the excavating according to the plans and specifications under my employment by Rogers, they were doing the excavating."

Humphries, in his testimony concerning the contract, also said that he "agreed to build the building for the estimated price." He said that his contract had no reference to the Goodman contract, "other," as he put it, "than I assumed the building of that building in its entirety, and excavation to every item of it." He had examined the site of the building before the signing of the contract, and saw and knew that the work of excavation was proceeding.

Goodman began excavating under his agreement with Rogers, the manager, and in accordance with general directions given by Rogers. Goodman saw no plans if there were any at the time he began work. He said that afterwards there were plans, but that he did not understand or read them. Thereafter, Stewart, as superintendent of construction for the Ice Company, set the stakes, and directed the work of excavation, until Humphries appeared as general contractor. A considerable part—about three-fourths of the excavating—had been done by the 28th of February, when the contract between the Ice Company and Humphries was signed. On that date or about that time, according to the testimony of Stewart, Humphries came on the work—took measurements, and made some changes, and reset stakes set by Stewart, and directed the excavating to be made according to his own instructions. While Stewart was the superintendent, it appears that thereafter the excavation proceeded in accordance with the actual directions of Humphries. Goodman testified that Rogers told him he had turned the job of excavating over

to Humphries; and Goodman said, that from that time he received his directions from Humphries—from the time Humphries came on the job—and that he was receiving his directions from Humphries at the time of the accident. Goodman said: "I saw bue prints, but I do not understand them. Mr. Rogers told me Mr. Humphries had charge of the excavating before I began excavating the ditches. . . . I was told by Rogers that Mr. Humphries had the general contract to erect the building in its entirety including excavating, and Mr. Rogers said that he (Mr. Humphries) had taken over the digging and was our boss." Humphries, after giving directions and resetting the stakes as above mentioned, was away from the work for a day or two, but returned about two days before the accident. At the time he returned, so Goodman says, the ditch or trench for the new wall had been dug to about fourteen or sixteen inches below the foundation of the old wall, and about three feet below the main surface of the cellar, according to directions theretofore given by Humphries; but up to this time there had been no excavation of earth from underneath the foundation of the old wall. Goodman's testimony is that Humphries told him this foundation had to be wider at the bottom, and he would have to take out six inches more. Concerning this direction, Goodman testified: "Now when Mr. Humphries wanted me to go under the wall, I told him it did not look good, and suggested digging out part of it and filling in with concrete before it was all dug out and he said it would be all right; that the roof would hold the wall, and that there would be no danger in going under six inches; and to show me and the men how to do it, Mr. Humphries spudded out about three feet and left the dirt on the bottom of the trench. The trench was the full thirty feet of the wall." Humphries testified that he showed Goodman how it should be done according to the specifications.

In the testimony of Humphries the following appears:

"Q. Did Mr. Goodman dig that ditch along the west side according to those plans and specifications? A. Well, he would not have done so unless I had forced him to do it that way."

Goodman also gave the following in his testimony: "I don't think Mr. Rogers talked to me about that wall, or whether he wanted that wall there; but he spoke to me about the wall in general, and I told him I would dig for sixty-five cents. He said he would take care of that, as there would be no deep excavation, and concrete would run in right after me, so that it would not cave in."

The conclusion is to be drawn from the testimony, that under Goodman's contract, made with Rogers, he was to do whatever excavating and removal of earth was necessary, and to do so for sixty-five cents a cubic yard; but it seems plain that the agreement did not include any provision that Goodman was to have anything to do

with shoring up the wall, or filling the trench with concrete or cement, by sections, as the earth was taken out.

Goodman employed the men, including the plaintiff, who were doing the work of excavating and paid them, and had the immediate control of them, in respect to having them do what Humphries directed to be done. Goodman was paid the sum of $444.75 for the excavating. Payment was made by two checks given to Goodman by the Ice Company. The first of these was for $300, and was dated February 22, 1924. The second check, given on March 22, 1924, for $44.75, contained the notation: "Digging for Humphries Contracting Company." Goodman said the last check was given to him by Rogers, in the company's office, and "immediately after Rogers and Mr. Humphries had been in there with each other, for awhile."

Stewart testified that he did not direct Goodman to dig underneath the old wall; and did tell him not to do so at any time, unless proper protection was made, saying: "I told him that when we came to that, we would shore the wall up, or that the wall would be shored up, or take the dirt out section at a time, and shore over the section where the dirt was removed and put in the foundation, piece at a time." Stewart also testified that after Humphries came on the work, Humphries was "giving directions—in other words, what I would have done if he had not come on the job. I passed it to him." According to Stewart's testimony, there had not been any undermining of the wall on the evening of the day before the wall fell. Stewart knew that under the location of the new wall, with reference to the old, and under the plans for the construction of the new wall, the undermining of the old wall was to be done. This was fully understood by Rogers, Stewart and Humphries; but they proceeded, taking no precautions. Stewart testified that undermining a wall without shoring or in some way protecting it, was "very dangerous."

Under the contention of appellant Humphries that his demurrer to the evidence should have been sustained, and sustained upon the ground that Goodman, as an independent contractor for the Ice Company, undermined the wall, and negligently caused plaintiff's injury, and is responsible therefor, and that appellant Humphries is not responsible, citation is made to numerous cases: Crenshaw, Admrx., v. Ullman, 113 Mo. 633; McGrath v. City of St. Louis, 215 Mo. 191; Kiser v. Suppe, 133 Mo. App. 19; Jackson v. Butler, 249 Mo. 342; Carson v. Blodgett Construction Co., 189 Mo. App. 120; Loth v. Columbia Theatre Co., 197 Mo. 328; Larson v. Metropolitan Street Railway Co., 110 Mo. 234; Salmon v. Kansas City, 241 Mo. 14; Lawhon v. St. Joseph Veterinary Laboratories, 252 S. W. 44; Borah v. Motor Co., 257 S. W. 145, and other cases.

The definition of the term "independent contractor" and the rule as to his liability, stated by this court in many cases, may be seen

in the opinion in Crenshaw v. Ullman, supra, at page 639: "The general rule is, that one who has contracted with a competent and fit person, exercising an independent employment, to do a piece of work, not in itself unlawful or attended with danger to others, according to the contractor's own methods, and without his being subject to control, except as to the results of his work, will not be answerable for the wrongs of such contractor, his subcontractors or his servants, committed in the prosecution of his work. An independent contractor . . . is one who renders service in the course of an occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished. The contractor must answer for his own wrongs and the wrongs committed in the course of the work by his servants." It is not necessary for the immediate purpose, to refer to all the cases above mentioned, and yet others cited in the briefs applying or denying application of the rule according to the circumstances shown.

In considering the demurrer, the plaintiff is to be given the benefit of all the evidence in his favor, and of all favorable inferences reasonably arising thereon. It is true that Goodman agreed to do the work of excavating at the rate of sixty-five cents per cubic yard, and that he employed and paid his own men in doing the work; but, it seems reasonably plain from the testimony that while Goodman was to excavate there, and to the extent directed, and was to be paid by the cubic yard, he was not required or expected to have anything to do with shoring up the wall to be undermined, or with determining the manner of its protection or paying the cost of protecting it. The testimony of both Stewart and Goodman tends to show that Goodman was not to be left to his own methods of excavating under the old wall, or could do that as and when he pleased. According to their testimony, under the original agreement between Goodman and the Ice Company, the method of doing that work, and the times when undermining excavation should be done, and the means of safety, were to be controlled by the Ice Company. Goodman was not to put in any foundation wall or concrete, but that was to be done by the Ice Company, and the excavating was to be done with reference to that. This, according to their testimony was the status of the agreement before the contract with Humphries was made, and Humphries came on the work. At this place further reference, and some explanation, should be made to certain clauses or items of the written exhibits introduced in evidence and above referred to. A reference has been made to the specifications, which contained the clause that the owner (Ice Company) would do all the excavating and furnish the foundation. The specifications were prepared pending, and doubtless in view of, the fact the Ice Company had set Goodman to work excavating before any general contract

was entered into. Humphries, in his estimate (referred to in the contract) made after the specifications were drawn, and after Goodman began work, included the estimate of $400 for excavating. The evidence tends to show Humphries had his choice of bidding for the whole, or, of bidding for the erection of the building after the excavation for foundation was done. His bid, accepted by the Ice Company, included the cost of excavation as to be borne by him, and he entered into the contract, executed February 28, whereby he undertook to furnish all the labor and materials for the erection of the building in its entirety; but, in executing the contract of February 28, the parties, by an evident oversight, left in the specifications referred to in the contract, the clause "providing that the owner would do the excavating and furnish the foundation;" but it is reasonably inferable from the testimony of Humphries himself, and all the circumstances, that Humphries understood that Goodman was at work; was to be paid sixty-five cents per cubic yard for excavating; and that Humphries in assuming to furnish all the labor and materials, had this in mind and intended to, and did adopt or take over to himself the agreement between the Ice Company and Goodman, for the purposes of the performance of his own contract with the Ice Company; and, that the cost of the work done by Goodman was to be charged against the amount Humphries was to receive for erecting the building in its entirety. The contract contained a provision that "the party of the first part (Ice Company) shall have all the gain made on all items but the brickwork which is item number 4 of the itemized statement attached—The amount of this item (brickwork) is $13,825."

Under the situation of these parties at the time of plaintiff's injury, Goodman was not undermining the wall according to a method selected by himself, but according to a method directly prescribed for him by Humphries, and permitted to be done by the Ice Company. This is in accordance with the testimony of Stewart that, after Humphries came upon the work, he, Humphries, gave instructions; did what he, Stewart, otherwise would have done; a duty, as Stewart says, "passed" by him to Humphries. Humphries' own statements tend the same way. To have sustained Humphries' demurrer would have been equivalent to a declaration by the court that, as a matter of law, Goodman was an independent contractor for the making of the excavation under the old wall, and was accomplishing a certain result after his own methods, and by his own means; and, would have been further equivalent to a declaration that as a matter of law, Humphries, while he was the general contractor, was not a contractor as to the excavating done directly under his orders, and in his presence, and in furtherance of the performance

of his contract to furnish all the labor and materials for the erection of the building in its entirely.

The same question under substantially the same testimony was before the St. Louis Court of Appeals in Stanley against these two defendants, 279 S. W. 157. Stanley was also a laborer in the excavating being done and at work near the plaintiff; was also injured by the fall of the wall, and had a verdict, and judgment, against both the Ice Company and Humphries, which was affirmed upon appeal. Much testimony is quoted in the opinion in that case.

Under the testimony in this case, it cannot be said as a matter of law that Goodman was doing the work in which he was engaged at the time plaintiff was injured, according to his own methods, and without being subject to control except as to the result of his work. The argument of counsel for Humphries is founded upon the premise that as between Humphries and Goodman, the latter was an independent contractor. But all of the testimony is to the effect, that Goodman caused the plaintiff and others to excavate, when and as they did pursuant to a direct demand made by Humphries; and according to the statement of Humphries, it would not have been done then, and in that manner, except it was "forced" to be done by Humphries. Certainly it could reasonably be inferred that Humphries had assumed the doing of that work, in that manner; and, that the manner and time of doing represented the will of Humphries, and not of Goodman. The court did not err in refusing the peremptory instruction of appellant Humphries.

The contention chiefly urged by appellant Ice Company is that Humphries was an independent contractor for the whole work, including the excavation which resulted in plaintiff's injury, and solely responsible for the negligence in the manner of excavating under the wall, and that it was error to submit the question whether the plan adopted was inherently or intrinsically dangerous. Counsel for the Ice Company urge that the only duty of the Ice Company or its building superintendent, Stewart, was to see that the building, as a result, was in compliance with the contract. Reference has heretofore been made to the testimony of Stewart, that the plan of excavating, as it was actually done, was "very dangerous," and to the testimony as to the agreement and instructions in force before Humphries came in, that Goodman was to do nothing more than excavate and remove the earth as required to be done; was not required to shore the wall, or to construct any foundation or portions thereof; and that the time and manner of making excavation under the wall, was to be controlled by the Ice Company, which was to supply the proper support from time to time, as the earth was removed from under the wall.

We have also referred to the testimony of Humphries and of

Stewart, concerning the contract. This testimony was introduced in view of the fact that Goodman was already at work when the contract between Humphries and the Ice Company was entered into, and in view also of the further fact that, under the terms of the contract itself, and of the specifications referred to therein, there was created some ambiguity. We mention these again, as related to the claim of the Ice Company that under the evidence, and as a matter of law, Humphries was an independent contractor and that the only duty of Stewart was to see that the building in its final result was a compliance with the contract. In another form, the contention for the Ice Company is that plaintiff and others doing the actual excavating were not servants of the Ice Company, and that the rule *respondeat superior* does not apply.

In support of the claim of the Ice Company that Humphries was an independent contractor, we are cited to a line of well-known decisions: Gayle v. Missouri Car & Foundry Co., 177 Mo. 427; McGrath v. St. Louis, 215 Mo. l. c. 210; Thomassen v. West St. Louis Water & Light Co., 278 S. W. 979. When the facts essential to characterize an employment are undisputed, the question of the relation created is one for the court; but where some or all of those facts are subject to controversy, or, under the conflicting or varying testimony, reasonable inferences may be drawn the one way or the other, the relation of independent contractor is one for the jury, under proper instructions. [Kipp v. Oyster, 133 Mo. App. 716, and cases there cited.] The appellants here occupy positions not only antagonistic to that of the plaintiff, but also antagonistic to each other, appellant, Humphries, contending that under the evidence as a matter of law, Goodman was an independent contractor for the Ice Company in doing the excavating which resulted in the plaintiff's injury, and the Ice Company claiming that Humphries was an independent contractor for the Ice Company in respect to that work.

Necessarily, under the instruction given, the verdict carried a finding that Humphries had taken over and assumed the entire work, including the excavation being done when the wall fell; and there was evidence to support such finding. The written contract and the plans and specifications, while they did not specifically refer to an excavation necessary to be made underneath the old wall, did, in fact, make such requirement because of the location of the new wall immediately next to the old wall, and because being so located the footing specified for the new wall carried it underneath the old. The plans were so understood and so acted upon by the parties, who, in making the contract, and projecting the work to be done, did so with these things in mind. The plans contained no provision or requirement designed to secure safety in excavating under the old wall, and extending of the footing of the new wall underneath the

old wall. This leads to the important question, especially pertinent under the claim of appellant Ice Company, whether the negligence resulting in plaintiff's injury was the combined fault of Humphries and of the Ice Company. Counsel for the Ice Company, starting with the premise that Humphries was an independent contractor, urge that the negligence was solely his negligence, and that under the rule which must be applied the Ice Company, the owner and contractee, is not liable for the result of the negligence. Numerous cases are cited. [Long v. Moon, 107 Mo. 334; Crenshaw v. Ullman, 113 Mo. 633; Gayle v. Foundry Co., 177 Mo. 427; McGrath v. St. Louis, 215 Mo. 191; Salmon v. Kansas City, 241 Mo. 14; Press v. Penny & Gentles, 242 Mo. 98; O'Hara v. Gas Light Co., 244 Mo. 395; Thomasson v. West St. Louis Water & Light Co., 278 S. W. 979; Kipp v. Oyster, 133 Mo. App. 711; Carson v. Blodgett Construction Co., 189 Mo. App. 120; Johnson v. Thrashing Machine Co., 193 Mo. App. 198.] In the cases mentioned there was recognized the rule that generally the independent contractor must answer for his own wrongs and the wrongs of his servants, and also the rule that a power reserved in the contract to superintend the work and see that the contract is complied with, does not make the contractor an agent or servant, or deprive him of the character of independent contractor. They also recognize certain exceptions to the rule first mentioned. These exceptions inhere as conditions, or elements in the definition of the term "independent contractor," or in the statement of what constitutes an independent contractor. One of these elements is that the work to be done by him, be "not attended with danger to others." The two-fold question arises then, whether the work to be done was one attended with danger to others in the sense those words are used, and if so, whether the plaintiff, who was not an employee of the Ice Company, is one of those "others" referred to. The rule, with the distinction to be drawn in a given case, to determine what constitutes a work attended with danger to others is stated in 39 Corpus Juris, 1331, as follows:

"A very important exception to the general rule exempting the contractee from liability for injuries caused by the negligence of an independent contractor or his servants is that, where the work is dangerous of itself, or as often termed is 'inherently' or 'intrinsically' dangerous, unless proper precautions are taken, liability cannot be evaded by employing an independent contractor to do it. Stated in another way, where injuries to third persons must be expected to arise unless means are adopted by which such consequences may be prevented, the contractee is bound to see to the doing of that which is necessary to prevent the mischief, and cannot relieve himself of his responsibility by employing some one else, whether it is the contractor employed to do the work from which the danger arises,

or some independent person to do what is necessary to prevent the act he has ordered to be done from becoming wrongful. The taking of these precautions, it is said, is a nondelegable duty owing to third persons who may sustain injuries from the work, and the contractor is considered an agent or servant for whose act his employer is responsible. The injury need not be a necessary result of the work; but it is sufficient that it will be a probable result of the work if proper precautions to guard against injury are not taken. However, the work must be such as will probably, and not which merely may, cause injury if proper precautions are not taken. If the work is of such a nature that it could be done without probable injury to any-one except in the event of negligence in the manner of doing it, no liability attaches to the employer.''

Another form of statement of the distinction from the general rule is, that, in the one case, the work is of such a character that, if properly done, no injurious consequences can arise, and in the other, the work is of a character from which danger is likely to arise un-less precautionary measures are adopted. [39 C. J. 1333.] It is well stated in the opinion of STURGIS, J., in Carson v. Blodgett Con-struction Co., 189 Mo. App. 126: ''The distinction seems to be that if the doing of the work necessarily causes danger which must be guarded against, then the employer must see to it that such dangers are guarded against, and cannot relieve himself by casting his duty on an independent contractor. If, however, the work is dangerous only by reason of negligence in doing it, then the liability falls only on the independent contractor. In the one case the doing of the work creates danger and requires active care to counteract the danger. In the other there is no danger unless created by negligence. The one starts with danger and requires preventive care to make safety, while the other starts with safety and requires negligence to make danger.''

Must it not be said that danger started with excavation under this wall? Another case is Loth v. Columbia Theatre Co., 197 Mo. 328, where the work of the contractor was the raising and lowering of an electric sign, which extended over a sidewalk. The work was of a character which was held to be inherently dangerous. The applica-tion was made in favor of a member of the public, a person walking upon the sidewalk, and not an employee of the contractor. Many of the cases are of a like character in that respect. Some of them in considering the question of liability of the contractee, draw a dis-tinction based upon the class within which the injured person falls. One of these is Salmon v. Kansas City, 241 Mo. 14, to be referred to again. The difficulty often met with in a given case, of making the distinction—determining whether the work or operation is intrinsical-ly dangerous—is frequently referred to in the discussion upon that

subject. [39 C. J. 1333; 14 R. C. L. 88.] In the last-named authority, it is said that ordinary building operations are not within the description of work of a character inherently or intrinsically dangerous. The work required to be done in the instant case, the excavation to be made underneath the wall of the height and character here shown cannot be deemed an ordinary building operation. Our conclusion is that it was an operation ''attended with danger to others,'' or, intrinsically dangerous, in that, its performance would likely result in damage, unless proper precautionary measures were taken.

In leaving this phase of the discussion we refer briefly to McGrath v. St. Louis, 215 Mo. 191, a case to which counsel for the Ice Company direct particular attention. It was one wherein the support of the wall of the building owned by the plaintiff was impaired by the excavation made by an independent contractor, under a contract with the city for the paving of a public alley, upon which the plaintiff's property abutted. The city was held not liable for the injury done to the plaintiff's building. Under the facts found and as stated in the opinion, there is a vital distinction between that case and this. In that case the contractor was not required by his contract to undermine the plaintiff's building. In this case compliance with what was actually agreed upon between Humphries and the Ice Company, made excavation underneath the wall, imperative.

There remains the other distinction, founded upon the fact that this plaintiff was the servant of the contractor. Thereon, the claim is made that the exception under discussion, although it may be applied to a member of the public, as a passer-by upon a public street near where blasting operations were being conducted, cannot be applied in any case to an employee of the independent contractor. That is the immediate question, raised under the ruling in Salmon v. Kansas City, 241 Mo. 14. In that case the plaintiff was the servant of an independent contractor who undertook the construction of a district sewer for Kansas City, wherein extensive blasting of rock was necessary. The sole work of the plaintiff was the drilling of holes in which the explosives were to be placed. He had nothing to do with placing of the shots or firing them, and the duty of determining that all explosives placed in a series of holes had been fired before drilling was begun on other holes near that place, was upon the foreman in charge of the blasting operations. The plaintiff was injured when drilling near where a shot had been placed which, undetected by the foreman, had failed to explode, but did so, while the plaintiff was engaged in drilling a hole. The majority opinion, in a much divided court, held the city was not liable, for the reason among others that the plaintiff was an employee of the contractor. It is said at page 39: ''It is a case where liability is

claimed because of the intrinsic danger attending the use of explosives." And it was further said that no text-writer or other case cited extended the protection of the doctrine to the employee of the independent contractor, and that the cases applying the doctrine did so only as to the class of adjoining proprietors, or of passers-by upon the street. The opinion then has the following:

"The doctrine of the cases referred to has no reference to a servant of the contractor engaged in blasting; certainly not when, as here, the injury to the servant results from the sheer negligence of the contractor or his foreman in failing to protect the laborer in work which in itself is not inherently dangerous. The drilling of a hole for a charge of dynamite is certainly not an inherently dangerous task. The negligence of the foreman, which it is charged was the immediate cause of the injury, was not the natural and obvious result of blasting; so that even if the doctrine of cases involving the rights of outsiders be extended to the servant of the contractor, the servant in this case would not come within the rule."

The opinion thus characterized the work to be done by the plaintiff, the drilling of a hole for a charge of dynamite, as not in itself an inherently dangerous task, and announced that the injury to the plaintiff resulted from the "sheer negligence" of the foreman in failing to protect the laborer in this not inherently dangerous work. However, a distinction is shown between that case and the case at bar. There, apparently, the omission of the foreman to detect the unexploded charge was regarded as a matter collateral to the work to be done, the omission (l. c. 42) of "performance of some casual act in the course of the work." At any rate it is obvious that it was the omission by the foreman of an act provided and expected to be done regularly in the course of the work. If done, there was no danger in drilling the hole for another charge of dynamite. In this case, the work at which plaintiff was engaged when injured was work at excavation and removal of the earth from underneath the wall, the very work which the contract required to be done, and work which itself created a dangerous condition, making it likely the wall would fall, unless precautionary measures were taken. There is the following further discussion in the opinion in the Salmon case, l. c. 41: "If the foreman himself had been injured by his own negligence averred in the petition, it would hardly be claimed that the city would be liable; yet the doctrine for which plaintiff contends would protect the foreman, or even the contractor himself, from the consequences of his own negligence. It would be a strange anomaly in jurisprudence were we to hold that an employer is liable to the servant of an independent contractor because of the negligence of the contractor or his foreman in the performance of some casual act in the course of the work. The owner owes no legal duty to such servant to pro-

tect him from the negligence of his foreman.'' Obviously the argument so made is unsound, because it ignores wholly the effect of contributory negligence, and is an assertion that the doctrine as to intrinsically dangerous work would impose liability upon the employer, whether the injured person was or was not guilty of contributory negligence. The ruling in the Salmon case is sound, in so far as it denied recovery against the city, for the reason that the particular event (failure to detect the unexploded charge) which produced the injury complained of, resulted from negligence which was collateral to the stipulated work—that is, not incidental to the stipulated work in such a sense that the city was bound to anticipate and guard against it. The distinction between that case and this is made manifest when it is considered that in this case the event which produced the injury, the undermining of the old wall, was the very thing required to be done in the erection of the new wall, and was a work attended with danger which the employer was bound to anticipate, and, as the evidence tends to show, did, in fact, anticipate except it should be done after a certain precautionary method. There was a duty upon the Ice Company in projecting a work attended with danger to others to use reasonable care to provide plans requiring the proper precautionary measure.

Cases dealing with the question of liability of the principal employer for injury sustained by a servant of the contractor in operations alleged to be intrinsically dangerous, are treated in the annotation found in 23 American Law Reports under the subdivisions beginning at page 1129, wherein it is said the decisions are not harmonious. They are there classified according to the grounds governing the respective decisions. In some, it was assumed that the doctrine arising upon intrinsic danger was no less controlling in actions brought by the servant of the contractor, than in actions brought by a third person. In others, there was denial of liability on the ground that the work in question was not inherently dangerous. In others, liability was denied on the ground that the particular event which produced the injury resulted from negligence which was collateral to the stipulated work. In this class is placed the Salmon case, as to one ground of the decision there made. In others, there is announced the broad doctrine that liability, in respect of inherently dangerous work, does not, in any case, enure to the benefit of the servant of the contractor. In that class, falls the further ruling made in the Salmon case, and also the ruling made in Schip v. Pabst Brewing Co., 64 Minn. 22, a case followed in the majority opinion in the Salmon case. The subject of liability of the principal employer to an employee of an independent contractor is also made the subject of an extensive annotation found in 44 American Law Reports, 932.

The position of the servant of a contractor is treated at length, and forcefully, in the dissenting opinion in the Salmon case, and the Missouri cases, including Horner v. Nicholson, 56 Mo. 220, are reviewed. In the dissenting opinion, l. c. 65, it is said: "The legal principle upon which the liability of the owner depends, is, that he shall not directly nor indirectly put his property to such use as probably to injure others, without at the same time assuming responsibility for such injuries in so far as they are caused by his own negligence or the negligence of his substitute in the work. This creates a non-delegable duty." The view therein was also expressed that the contention that an owner might be liable to the public, but not to the servants of the contractor, was without support either in reason or authority.

There is no contractual relation between the owner and the servant of the independent contractor; and, under that view, such servant as to the principal employer, is entitled to his remedial rights on the same footing as others. In this case it is unquestioned, under the evidence, that the principal employer understood and appreciated the danger, but in the contract and under the plans referable to the work to be done by Humphries, took no precautions, in the specifications themselves or by oral instruction or warning to Humphries, or to plaintiff. Stewart, the superintendent, does not testify that he gave any warning or instruction to Humphries concerning protection of the wall. Humphries says no one told him there was danger in undermining the wall. However, he had been a building contractor for twenty-two years. There is no claim that either of them, or anyone advised the plaintiff, who was a common laborer, and a negro, of the danger. Under all the circumstances of this case we are not willing to follow and apply the broad rule stated in the Salmon case, which would inflexibly exclude the plaintiff upon the single ground that he was the servant of the contractor. We hold the court committed no error in overruling the demurrer to the evidence, offered by the Ice Company.

Some of the assignments respectively made by the appellants remain.

On behalf of the Ice Company it is assigned as error, that under plaintiff's Instruction 1 there was submitted an issue whether the plans and specifications provided for digging along and under the old wall while the old wall remained standing, and it is insisted there was no evidence on which to base that part of the instruction. We cannot assent to that view. Under what has been set out, it was understood all of the time by all the parties—the architect who prepared the plans, the manager of the Ice Company, its building superintendent and Humphries—that the new wall was to be built along and against the old wall, and the old .

wall was to stand pending the erection of the new. The appellants made the contract under that assumption and in view of that fact, although no special reference thereto was made in the written contract. They acted accordingly, and the jury were fully warranted, indeed could not do otherwise than find that, pending erection of the new wall, the old wall was to stand.

The other objection to the same instruction is, that the instruction submitted the issue not only whether the plans and specifications provided for digging along under the old wall while standing, but also whether it was intrinsically and inherently a dangerous plan, and it is urged there was no substantial evidence upon which to base such instruction. For the reasons heretofore stated we hold there is no merit in that complaint.

On behalf of appellant Humphries, error is assigned in the giving of plaintiff's Instruction 2. The first objection made is founded upon the claim that under the evidence the plans and specifications  contained the provision that the owner would do all the excavating and furnish foundation complete, and also that under the evidence Goodman's contract called for him to do all the excavating; that the Ice Company was Goodman's paymaster, and paid him for his work. Under the state of the evidence as hereinbefore set out, we must hold that the objection is without merit. The manner of payment of Goodman and of plaintiff, who received his wages from Goodman, is not conclusive of the relation, and the question was one for the jury. Humphries was asked and was given an instruction that if the excavation was done by Goodman through a contract with the Ice Company, and that Humphries had no interest in the digging except to see that it was done according to the plans and specifications, no recovery could be had against Humphries.

Another complaint on the part of appellant Humphries is that under plaintiff's Instruction 2, which particularly referred to Humphries, is that it "leaves out the liability of the Ice Company under its contract with Goodman." The status of the Ice Company was hypothesized and submitted under plaintiff's Instruction 1. The jury found against both defendants, and the omission of reference to the liability of the Ice Company in plaintiff's Instruction 2, did not prevent a finding against the Ice Company, and therefore it is not seen how appellant Humphries was harmed by the matter immediately complained of.

On behalf of appellant Humphries, it is urged that the verdict is excessive, but the Ice Company has not raised that question. The

plaintiff was a negro, and a common laborer, and a little more than forty years of age. He was somewhat hard of hearing prior to this accident, but otherwise was an able-bodied man, and was earning a little more than three dollars a day at the time of his injury. Several physicians testified as to the injuries as they appeared, after the accident, and also as to the condition of the plaintiff at the time of the trial. From this testimony it appears that the tibia of his right leg was fractured, but apparently there was a recovery of this; but, their testimony shows that the large bone of the left leg was broken, the parts, as they expressed it, "mashed together." There was also a fracture or injury to the bones of the pelvis, and there was said to be a crepitation of these bones at the time of the trial. After the accident a large abdominal abscess formed in the left lower quadrant of the abdomen, from which a great quantity of pus was taken. The physician who examined him on the morning of the trial testified that his condition was highly nervous, and that he was still suffering considerable pain; that the left socket of the pelvis had been crushed; that the left leg was one and a half inches shorter than the other. There was also testimony that the plaintiff's left hand was injured so that it was of no use. Dr. Charles P. Lewellyn, who examined the plaintiff just before the trial and took X-ray pictures of his joints, testified that the picture of the left hip showed that in the fracture of the big bone of the left leg, one part of the bone had been driven into the other part—not broken apart or in two, but mashed together. The neck of the bone was driven into the ball. Their testimony is to the effect that the injuries are permanent. One of the physicians testifying, summed up the condition of the plaintiff as follows: "Well, he is unable to walk without the aid of crutches. He can't stoop over at all because of the tension brought about in his hip; his hearing is entirely gone, and his ability to ever do anything as far as I am able to find out, has gone. He will never be able to do any labor of any kind." A physician testified that as a result of his injured condition he was highly susceptible to infection. Plaintiff himself testified that he was in bed three months after his injury; "Was hardly able to get around at all now," and had not been able to do any work since his injury. The jury had the advantage of hearing, in detail, the testimony of physicians, and of seeing the plaintiff as did the trial judge, who evidently did not consider the verdict excessive, and in view of the testimony as to plaintiff's injuries and sufferings, and to the effect that he will never be able to perform any labor, we are not warranted in disturbing the verdict, and the judgment is affirmed. *Seddon* and *Ellison, CC.,* concur.

PER CURIAM:—This cause coming into Court en Banc, the foregoing opinion of LINDSAY, C., in Division One, is adopted as the decision of the court. All of the judges concur.