Pamela AUBUCHON,
Plaintiff/Respondent/Cross–Appellant,

v.

Robert F. HYLAND and David Wilhelm, d/b/a Riverfront Place, L.P., Defendants/Appellants/Cross–Respondents.

Nos. 59317, 59319.

Missouri Court of Appeals,
Eastern District,
Division Three.

Nov. 5, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 19, 1991.

Application to Transfer Denied
Jan. 28, 1992.

Godfrey P. Padberg, St. Louis, for Pamela Aubuchon.

Larry D. Valentine, Donald L. James, Michael T. Ward, James Peter Leonard, St. Louis, for Robert F. Hyland and David Wilhelm.

STEPHAN, Judge.

Pamela Aubuchon ("Pamela"), the widow of Robert Aubuchon ("Robert"), filed a wrongful death action on behalf of: (1) herself; (2) Alexis Christine Aubuchon ("Alexis"), the couple's minor daughter; and (3) Amy Renee Aubuchon ("Amy"), Robert's daughter by his first marriage, against Robert Hyland ("Hyland") and David Wilhelm ("Wilhelm"), d/b/a Riverfront Place, L.P., who are the owners of the MCI Building in downtown St. Louis. Robert fell to his death on April 23, 1986, while working as an ironworker during the construction of this building. After a four-day jury trial, the jury returned a verdict for the plaintiffs. It assessed damages at $1,700,000, apportioning 70% fault to the defendants and 30% fault to Robert, thereby awarding the plaintiffs $1,190,000. All parties currently appeal. We reverse.

Hyland and Wilhelm organized Riverfront Place to: (1) acquire the land located at Fourth and Walnut Streets in the City of St. Louis; and (2) develop the MCI Building upon these premises. Riverfront Place contracted with a general contractor, the C.

Rallo Contracting Company, to construct the project. Rallo then subcontracted with Stupp Brothers for completion of the ironwork. Stupp Brothers, in turn, subcontracted the actual erection of the structural steel to Ben Hur Construction Company, Robert's employer.

On April 23, 1986, Robert worked as part of a "raising gang". The "raising gang" consisted of five men: two hook-on men, two connectors and one foreman. The hook-on men worked on the ground, attaching steel beams to a crane cable. The crane would then lift the beams to the connectors who would place the beams in position and secure them. That morning, the raising gang set three vertical columns, two high, in the northeast corner of the building. The raising gang then began to connect some of the horizontal cross-members or floor beams. Just before the accident, they had completed the mezzanine and second floor levels. The raising gang then began setting the third floor. The hook-on men attached approximately seven steel beams to the crane boom line. The crane then lifted these beams to Robert and Steve Barnes, who were working as the connectors. Robert and Barnes took the floor beams, one beam at a time, starting with the lowest beam first, and bolted them in place. Robert and Barnes safely set four beams. As they attempted to move the boom line in order to set the fifth beam, a hook from a previous beam got caught under the flange of the beam on which Robert was standing. Robert walked out on the beam to shake the hook loose. As he did this, the tension from the boom line rotated the beam, causing Robert to fall to his death.

Two years later, on May 18, 1988, Pamela filed suit against the defendants, on behalf of herself, Alexis and Amy. The cause was tried before a jury from September 11 through September 14, 1989. Evidence at trial revealed that safety nets were available at the construction site on April 23, 1986. Although nets could have been placed into position in the area where Robert was working, they were not. In fact, the absence of scaffolding or netting

in this situation, where a worker was more than twenty-five feet over the ground, constituted an Occupational Safety and Health Administration regulation violation. Although the defendants presented evidence that: (1) they surrendered control of the premises to Rallo on January 6, 1986; (2) neither they nor the Forsythe Group had any involvement in the actual construction process; and (3) neither they nor the Forsythe Group attempted to control the day-to-day activities of the job site workers, the jury returned a verdict for the plaintiffs. It is from this verdict that all parties appeal.

The defendants raise eight points on appeal. They argue that the trial court erred in: failing to grant defendants' motions for directed verdicts, giving certain instructions, and overruling defendants' objections during plaintiffs' closing argument. Plaintiffs raise one point on cross-appeal. They argue that the trial court erred in submitting an instruction and in reducing the judgment for fault assessed against Robert.

■■■■ We begin with the defendants' contention that argues that the trial court erred in failing to grant their motions for directed verdicts. Where failure to grant a directed verdict for the defendant is the error asserted, we review the evidence presented at trial to determine whether or not the plaintiff introduced substantial evidence that tends to prove the facts essential to plaintiff's recovery. *Schaffer v. Bess*, 822 S.W.2d 871, 876 (Mo.App.1991). If the plaintiff has introduced substantial evidence, we will not find that the trial court committed reversible error. *Id.* In reaching this determination, we review the evidence in the light most favorable to the plaintiff, giving him the benefit of all reasonable inferences, and disregarding the defendant's evidence except as it aids the plaintiff's case. *Id.*

At trial, the plaintiffs argued that: (1) structural steel erection for a twelve-story building is an ultrahazardous activity which involves a substantial risk of injury to workmen if proper and adequate precautions are not taken to prevent workmen from falling from the structure; (2) the defendants had a non-delegable duty to insure that proper and adequate precautions were taken to prevent injury to workmen as a result of falling from the steel structure during construction; (3) the defendants negligently failed to insure that such precautions and preventative measures were taken; and (4) this failure was the proximate cause of Robert's death.

Since this trial, our Supreme Court decided *Zueck v. Oppenheimer Gateway Properties*, 809 S.W.2d 384 (Mo. banc 1991). In that case, the Supreme Court noted:

> Under the common law, one who contracts with an independent contractor is generally not liable for bodily harm caused by the torts of the contractor or the contractor's servants. Where, however, the activity undertaken by the independent contractor is inherently dangerous, the common law recognizes an exception and subjects the landowner to liability to innocent third parties for injuries resulting from failure of the independent contractor to take special or reasonable precautions against the inherent risks or dangers. *Id.*

The Court went on to note that in *Mallory v. Louisiana Pure Ice Supply Co.*, 320 Mo. 95, 6 S.W.2d 617 (Mo. banc 1928), it extended the inherently dangerous exception to an employee of an independent contractor, making the landowner vicariously liable for the employee's injuries. *Id.* The Court then noted that although it strayed from *Mallory* at one time, it later returned to the standard enunciated therein.

Thereafter, the Court took a closer look at *Mallory*. It noted that the accident suffered by the employee in *Mallory* occurred in 1924, before the advent of the workers' compensation law. It further noted that under *Mallory*, the landowner's liability was vicarious; it did not flow from the landowner's own negligence. The landowner thus became the insurer of the employee's injury, even though the independent contractor's negligence may have caused the injury. *Id.* at 387. The Court then stated that by expanding the common

law purpose of protecting innocent third parties to permitting its use by employees of the independent contractor, such as in cases following *Mallory*, it has placed landowners in an untenable position since landowners cannot define, with any certainty, whether an activity is inherently dangerous or not. *Id.* Moreover, frequently the reason that landowners hire independent contractors is because they are aware of their own lack of expertise and seek to have the work performed as safely and efficiently as possible by hiring those possessing the expertise they lack. *Id.* at 387–388. The Court further noted that landowners may choose to avoid the liability imposed by the inherently dangerous exception by directing their own employees to do the work despite their lack of expertise, thus limiting landowners' liability to that provided by workers' compensation law. *Id.* That choice, in reality, actually increases the risk of injury to the employees and to innocent third parties. *Id.*

In an effort to cure this anomaly, the Court held that the inherently dangerous exception no longer applies to employees of independent contractors covered by workers' compensation. *Id.* at 390. The Court explained its holding, stating that the underlying policy rationale announced in *Mallory* —that the application of the inherently dangerous doctrine to employees of independent contractors placed those employees in the same position as innocent third parties—was accomplished with the advent of workers' compensation law. *Id.* at 389. In closing, the court explicitly overruled *Mallory* and cases following *Mallory*, including *Ballinger v. Gascosage Electric Cooperative*, 788 S.W.2d 506 (Mo. banc 1990), to the extent that those cases are inconsistent with its opinion. *Id.* at 390.

■ The above indicates that if Robert were injured today, under no circumstances could he recover from the landowners. However, since Robert's injury occurred before our Supreme Court decided *Zueck*, we now address the issue of whether *Zueck* should be applied retroactively.

In *Sumners v. Sumners*, 701 S.W.2d 720, 723 (Mo. banc 1985), our Supreme Court cited Chief Justice Marshall's statement in *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). That statement provides in pertinent part:

It is in the general true that the province of an appellate court is only to inquire whether a judgment when rendered was erroneous or not. But if, subsequent to the judgment, and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied.

The Supreme Court recognized that although this rule was originally announced in the context of a change in applicable treaty provisions, it now applies to changes in decisional law. *Id.*

The Court, while recognizing that retroactive application is the general rule, noted that there are two exceptions when retroactive application does not apply: first, if the change pertains to procedural as opposed to substantive law; and second, if fundamental fairness dictates otherwise. The Court enunciated a three part test to resolve the issue of fairness in determining whether an overruling decision should be given prospective-only effect:

First, the decision in question 'must establish a new principle of law ... by overruling clear past precedent....' ... Second, the Court must determine whether the purpose and effect of the newly announced rule will be enhanced or retarded by retrospective operation.... Third, the Court must balance the interests of those who may be affected by the change in the law, weighing the degree to which the parties may have relied upon the old rule and the hardship that might result to those parties from the retrospective operation of the new rule against the possible hardship to those parties who would be denied the benefit of the new rule.

We now turn to the facts of our case and apply these tests.

Initially, we note that the first exception to retroactivity is inapplicable here since *Zueck* announced a substantive, not proce-

dural, change in the law. We now apply the three-part fundamental fairness test.

First, does *Zueck* establish a new principle of law by overruling clear past precedent? We hold that it does not. Rather, although *Zueck* overrules *Mallory* and other subsequent case law, it reflects a return to the state of the law pre-Mallory.

Second, will the purpose and effect of the newly announced rule be enhanced or retarded by retrospective operation? The purpose of *Zueck* is to promote the workers' compensation system, which is a product of trade-off: the employer (here an independent contractor) forfeits his common law defenses to suits against him for his employee's injuries and assumes automatic liability; the employee forfeits his right to a potentially lucrative common law judgment in return for assured compensation. *See Zueck* at 388. Retrospective operation enhances the purpose and effect of *Zueck* by upholding the balance the legislature previously struck in enacting the workers' compensation law.

Third, what hardship will result to the parties who relied upon the old rule if the new rule is applied retroactively? If we allowed the plaintiffs to recover, the plaintiffs would recover for Robert's death twice: (1) in the form of workers' compensation;[1] and (2) in the form of a judgment entered pursuant to a jury's award. Similarly, the defendants would be held liable for Robert's death twice: (1) since the defendants accepted the contractor's, Rallo's, bid which included the cost of maintaining workers' compensation insurance; and (2) in the form of a judgment entered pursuant to a jury's award. The unequal balance which would result if *Zueck* is not applied clearly indicates that *Zueck* must be applied retroactively.

Since *Zueck* is not only the current state of the law, but also must be applied retroactively, we hold that the trial court erred in not directing a verdict for the defendants. We, therefore, reverse.

REINHARD, P.J., and AHRENS, J., concur.

---

1. It appears from the record that the plaintiffs were, or are currently, receiving Workers' Compensation benefits as the result of Robert's death. The record reflects that plaintiffs' counsel made a motion in limine, based on the collateral source rule, to bar the introduction of evidence relating to plaintiff's receipt of Workers' Compensation. The trial court granted plaintiffs' motion. Furthermore, during Pamela's in-court testimony, defense counsel requested a bench conference to clarify the extent of this motion in limine. Defense counsel indicated that Pamela was receiving income from a variety of sources. Moreover, the trial court explicitly stated, two times during this conference, that it would not permit defense counsel to mention Pamela's receipt of Workers' Compensation benefits.