Brent N. BALLINGER, Appellant,

v.

GASCOSAGE ELECTRIC COOPERA-
TIVE, Tel–Elec Company,
Respondents.

No. 72068.

Supreme Court of Missouri,
En banc.

April 17, 1990.

Dale L. Beckerman, Spencer J. Brown, Mimi E. Doherty, Kansas City, for Gascosage.

Timothy Gammon, B.H. Clampett, Craig S. Oliver, Springfield, for Tel–Elec.

Thomas Strong, Steven D. Herrell, Jeffrey W. Bates, Springfield, for Ballinger.

BLACKMAR, Chief Justice.

The plaintiff, an unskilled electrical construction worker, recovered judgment for $1,500,000 on a jury verdict against Gascosage Electric Cooperative and its contractor, Tel–Elec Company. Both defendants appealed, and the plaintiff appealed from the refusal of his requested punitive damage instruction.[1] The Court of Appeals, Southern District, reversed and remanded for new trial, treating the multiple issues in a comprehensive opinion. It transferred the case to us "because of the general interest and importance of a question involved in the case or for the purpose of re-examining the existing law." Mo. Const. art. V, § 10; Rule 83.02. We now assume jurisdiction of the entire case as on initial appeal. We affirm on the appeals of Gascosage and the plaintiff, but reverse and remand for further proceedings on Tel–Elec's appeal. We borrow freely from Judge Flanigan's well-crafted opinion without using quotation marks.

### 1. The Facts

On November 1, 1983, the plaintiff, while working as a "groundman," was seriously injured by an electrical shock. The accident occurred during the course of a renovation project known as the "Iberia Re-

---

1. Briefs totaling 489 pages were filed in the court of appeals, apparently without prior leave of court. The parties apparently adhered to the theory that a separate page limit was available in the plaintiff's appeal and in each defendant's appeal. This is a questionable interpretation of Rule 84.04(i) at least insofar as the cumulative respondent's briefs are concerned. Supplemental briefs were filed here, resulting in total briefing of more than 662 pages.

phase," which included the installation of 19 new poles to replace the poles supporting a single phase line carrying 7,200 volts of electricity. The new poles, numbered from west to east, spanned a distance of approximately one mile on the north side of, and generally parallel to, Highway 42 west. The single phase line, consisting of one energized line called the "hot phase" and a "neutral," was to be replaced by a three phase line consisting of three energized lines, or conductors, and one neutral.

On August 16, 1983, Gascosage and Tel–Elec entered into a contract for Tel–Elec to construct the Iberia Rephase. The contract provided that the work was to be done "hot," that is, with the three phase line being strung while the "hot phase" of the single phase line remained energized so that the electrical service to customers would not be interrupted.

Eazy Construction Company was not a party to the action but played an important role in the litigated event. The precise business relationship between Tel–Elec and Eazy must be determined by further evidentiary hearing, but the parties agree that Eazy, and not Tel–Elec, did all the work on the Iberia Rephase, and that the plaintiff had been hired as a groundman by Eazy on October 28, 1983.

The accident occurred in the afternoon of November 1, 1983. The "A" and "C" conductors had been tightened up and the crew was working on the "B" conductor. To remove the excess slack a lineman up in a "cherry-picker" would attach a rope handline to the conductor. The rope ran through a set of pulleys on the pole to a pickup truck to which it was attached. The truck would pull the slack out of the conductor. The excess length of conductor ran down the backside of the pole, and was rolled up on a wire take-up reel.

At the time of the accident plaintiff was tending the wire take-up reel located near pole 1. He had his left hand on the reel and his right hand on the B conductor. While the B conductor was being pulled by the truck it came into contact with the hot phase at a point between pole 9 and pole 10. It became energized and as a result Ballinger sustained serious and multiple injuries.

Plaintiff's trial theory was that the accident was caused by the negligence of Eazy and that Tel–Elec and Gascosage were both vicariously liable for Eazy's negligence under the "inherently dangerous activity" doctrine. Basing its verdict on Instruction 8, quoted below, the jury found the issues in favor of plaintiff and against Gascosage and Tel–Elec, finding that they were both responsible for the conduct of Eazy and 100 percent at fault, and that the plaintiff was without fault. The verdict assessed his damages at $1,500,000.

The lengthy jury trial was held in October of 1987. In April of 1985, in a proceeding under the Workers' Compensation Act, the plaintiff had received a lump sum settlement payment of $90,000 in addition to benefits previously received. The transcript of the hearing at which the compromise settlement was approved lists Ballinger's employer as "Tel–Electric (sic) d/b/a Eazy Construction Company." That transcript contains a stipulation, to which the plaintiff and his attorney agreed, that on November 1, 1983, he "while in the employ of Tel–Electric, d/b/a Eazy Construction Company, sustained an accident arising out of and in the course of [his] employment."

Prior to the jury trial, Tel–Elec moved for summary judgment on the ground that the workers' compensation settlement was a bar to Ballinger's civil action against Tel–Elec. The plaintiff requested a separate trial on the "workers' compensation issues," as did Tel–Elec. Tel–Elec's motion stated that it was engaged in a joint venture with Eazy at the time of the accident. The trial court ordered a separate trial as sought, and the jury trial was not concerned with the workers' compensation issues.

After the verdict was returned, the trial court sustained the plaintiff's motion for summary judgment against Tel–Elec "on the issue of workers' compensation immunity," and denied Tel–Elec's motion for summary judgment. Judgment was entered in accordance with the verdict against both defendants, with a $100,000 credit for

a prior settlement with a dismissed party. The three parties filed separate appeals.

### 2. Submissibility

■ Gascosage has three specifications as to why it considers that the plaintiff has not made a submissible case. The third, absence of evidence of negligence on the part of Gascosage, is ruled adversely to it for the reasons discussed in Part 3 of this opinion. We conclude that the others also lack merit.

Gascosage first asserts that Tel–Elec breached its contract by assigning its whole performance to Eazy, in violation of the contract provision against subcontracting more than 25% of the work. This argument fails for a number of reasons, the most evident being that the contract permitted subcontracting, rather than forbidding it. Gascosage cannot avoid liability simply because Tel–Elec may have exceeded the boundaries of its permission. *See City of New York v. Benenson*, 41 Misc.2d 20, 244 N.Y.S.2d 653, 657 (N.Y.Civ.Ct.1963). *Cf. Porter v. Thompson*, 357 Mo. 31, 206 S.W.2d 509, 511–12 (1947) (Employer still liable for employee's conduct even though contrary to his orders); *Baker v. McGue–Moyle Dev. Co.*, 695 S.W.2d 906, 912 (Mo. App.1984).[2]

■ It next argues that there is no evidence that the activity of installing new conductors in the vicinity of an energized line is an "inherently dangerous activity." It points to evidence that "hot" installations of this kind are a normal part of the installation and renovation of electrical transmission lines and are regularly done without incident. The essence of inherent danger, however, is the need for special precaution. It is not sufficient for the defendant to show that the work can be done safely. For authority we need go no further than *Smith v. Inter–County Telephone Co.*, 559 S.W.2d 518 (Mo. banc 1977), holding that the digging of a narrow vertical trench, which may collapse and cause injury if it is not properly shored, may be found to be an inherently dangerous activity. What is said as to the pressures of a vertical wall of earth applies, *a fortiori*, to the powerful, speedy and capricious forces of electricity. *Hofstetter v. Union Electric Co.*, 724 S.W.2d 527 (Mo.App.1986), involving a fall from the step of a ringer crane, is not at all in point.

The defendants do not question the sufficiency of the evidence to show that Eazy was negligent. We reject Gascosage's challenges to the submissibility.

It is argued that there was reversible error in allowing witnesses to testify, over objection, that the rephase project was "inherently dangerous." We disagree. The phrase consists of words in common use. A question is not necessarily objectionable simply because it is phrased in terms of one of the hypotheticals of an instruction.[3] It matters not that the court, in its discretion, might properly have sustained the objection to the question as put.

### 3. The Instruction on Vicarious Liability

The plaintiff's verdict directing instruction reads as follows:

In your verdict you must assess a percentage of fault to defendants Tel–Elec and Gascosage, whether or not plaintiff Brent Ballinger was partly at fault, if you believe:

First, the installation of new conductors near the energized conductor at the Iberia rephase was an inherently dangerous activity, and

---

**2.** We do not have to decide what the legal consequences would be if the contract had flatly prohibited all subcontracting.

**3.** *Eickmann v. St. Louis Public Serv. Co.*, 363 Mo. 651, 253 S.W.2d 122, 130 (1952) ("The province of the jury is to hear all the evidence including opinion evidence, to weigh it all, and to decide the issues. Thus an opinion (evidence) cannot invade the province of a jury...."); *Galvan v. Cameron Mut. Ins.*, 733 S.W.2d 771, 774 (Mo.App.1987) ("These observations did not require expertise and while some of his answers were conclusive such is permissible by a lay witness when used to articulate a summary of conditions.") *Cf.* Fed.R.Evid. 704, "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Second, during said installation, Eazy either:

failed to maintain proper clearance between the hot phase and the B phase, or

failed to keep the B phase under positive control, or

failed to adequately ground the B phase, or

failed to supply plaintiff Brent Ballinger with rubber gloves, and

Third, in any one or more of the respects submitted in paragraph Second, Eazy was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause damage to plaintiff Brent Ballinger.

The term "inherently dangerous activity" as used in this instruction means an activity which necessarily presents a substantial risk of damage unless adequate precautions are taken.

In assessing any percentage of fault to Tel–Elec and Gascosage under this instruction, you must consider the fault of Eazy as the fault of both Tel–Elec and Gascosage.

The defendants argue that this instruction is erroneous under our holding in *Smith v. Inter–County Telephone Co.,* 559 S.W.2d 518 (Mo. banc 1977), in which a plaintiff had obtained a verdict on a theory of contractual assumption of liability. The opinion concluded that that theory was not supported by the evidence but that the plaintiff might be able to make a case under the "inherently dangerous activity" exception to the general rule that a person employing an independent contractor is not liable for the negligence of the contractor. The opinion set forth the elements of this possible claim as follows:

(1) performance of the contract necessarily involves some inherently dangerous activity; (2) the activity which caused the damage was reasonably necessary to the performance of the contract and was inherently dangerous; (3) *the one contracting with the independent contractor negligently failed to insure that adequate precautions were taken to avoid damage by reason of the inherently dangerous activity; and (4)*

*plaintiff's damage was a direct result of such negligence. Inherently dangerous activity is that which necessarily presents a substantial risk of damage unless adequate precautions are taken.* (Emphasis supplied).

*Id.* at 523.

The plaintiff contends that the third and fourth specifications departed from prior Missouri law in requiring a showing of continuing negligence on the part of the owner, following the employment of an independent contractor to perform an inherently dangerous activity. He adduces the Restatement (Second) of Torts, in the introductory note to § 416–429, reading as follows:

The rules stated in the following §§ 416–429, unlike those stated in the preceding §§ 410–415, *do not rest upon any personal negligence of the employer.* They are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, *irrespective of whether the employer has himself been at fault.* They arise in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor. The liability imposed is closely analogous to that of a master for the negligence of his servant. (Emphasis supplied).

The plaintiff cites several earlier Missouri cases as being consistent with the Restatement view and inconsistent with *Smith,* as follows: *Loth v. Columbia Theater Co.,* 197 Mo. 328, 94 S.W. 847, 854 (1906); *Carson v. Blodgett Construction Co.,* 189 Mo.App. 120, 174 S.W. 447, 448 (1915), quoted with approval in *Mallory v. Louisiana Pure Ice & Supply Co.,* 320 Mo. 95, 6 S.W.2d 617, 624 (banc 1928); *Stubblefield v. Federal Reserve Bank,* 356 Mo. 1018, 204 S.W.2d 718, 722 (Mo.1947); *Barkley v. Mitchell,* 411 S.W.2d 817, 826 (Mo. App.1967). As the court of appeals points out, the *Smith* opinion cited the last four of these cases as authentic exposition of the Missouri law, without any indication that it was imposing requirements not previously found in the case law. The court of ap-

peals frankly stated that elements (3) and (4) of the *Smith* formulation are "at war with earlier Missouri case law." It felt bound to follow *Smith*, but elected to certify the case here because of the importance of the question.

The defendants understandably heap lavish praise on the *Smith* opinion. They recognize that the formulation of elements is inconsistent with the Restatement analysis, saying:

> Faced with the existence of different rules applicable to this class of cases, the court announced in *Smith* the rule that Missouri would follow.

They find language in some of the Missouri cases suggesting that a plaintiff who relies on the inherently dangerous activity doctrine must demonstrate continuing negligence on the part of the owner.

Our examination of the authorities persuades us that the analysis of the court of appeals is correct and that the *Smith* opinion listed elements not previously required by Missouri case law. That opinion wrote beyond the necessities of the case. The principal holding was that the plaintiff's "contractual assumption" submission was not warranted. The elements of a correct instruction were not argued by either party. In an attempt to provide guidance the opinion produced confusion. It is far better to make correction now than to perpetuate an erroneous rule of law. The plaintiff took a risk in requesting an instruction that conflicted with *Smith*, but we now conclude that the instruction was not erroneous.

■ We believe that the Restatement correctly reflects Missouri law and that there was no purpose in *Smith* to change the governing law. Persons are usually held liable for negligence on the part of those they hire to accomplish their purposes. There is an exception for the hiring of independent contractors responsible to the employer for the result bargained for, but not subject to control as to the means of accomplishment.[4] The exception does not apply if the work contracted for is an "inherently dangerous activity."[5] For activities of this kind the owner remains liable for the torts of the contractor, simply for commissioning the activity. The liability attaches without any need for showing that the employer is in any respect negligent. It is purely vicarious. Thus Gascosage is liable because it contracted for the work, and Tel–Elec is liable for procuring Eazy to perform the inherently dangerous activity unless it can establish the defense considered in Part 4.

■ Gascosage takes issue with the definition of "inherently dangerous" in the plaintiff's verdict directing instruction, arguing that the definition should have included additional language submitted by it as follows:

> An activity is not inherently dangerous where the risk involved does not arise from the very nature of the activity itself but is a risk which could have been prevented by routine precautions of a kind which a careful contractor would be expected to take.

The definition in the verdict director is taken from *Smith* and is similar in form to several definitions in MAI.[6] The addition suggested by Gascosage, even if it might have some application in other situations, is certainly not appropriate in this case, because the danger arose from the "very

---

**4.** "An independent contractor is one who, exercising an independent employment, contracts to do work according to his own methods, without being subject to the control of his employer, except as to the result of his work." *Coul v. George B. Peck Dry Goods Co.*, 326 Mo. 870, 32 S.W.2d 758, 759 (1930).

**5.** *Smith v. Inter–County Tel.*, 559 S.W.2d 518, 521 (Mo. banc 1977) and cases there cited including *Stubblefield v. Federal Reserve Bank*, 356 Mo. 1018, 204 S.W.2d 718, 722 (1947).

**6.** "[D]efinitions are necessary to interpret a legal term for a lay jury ... [I]n the definition instructions, again the trial court is instructing the jury in the law without giving rules of law which declare the legal duties or rights of the parties." MAI–3d at XCV. Because the definition tendered by Gascosage attempts to define the legal term "inherently dangerous" in terms of duty ("which a careful contractor would be expected to take") it was properly refused. *Cf.* MAI–3d 16.01 (defining legal malice) and 16.04 (defining substantial performance).

nature of the activity," i.e., stringing new electrical conductors in close proximity to an energized, or "hot", conductor.

Tel–Elec raises the hoary argument of "roving commission" in the disjunctive submission of "failed to keep the B phase under positive control." We believe that the submission is sufficiently narrow and that it is consistent with the MAI format. The witnesses explained the meaning of "positive control." Evidence showed that the sagging in the new conductors allowed them to move about uncontrollably and that there were means of controlling the sag. The danger of a mobile line near to an energized line is patent. We entertain no doubt that the jury understood the submission. Nor do we perceive that the term "installation" is so vague as to be subject to the "roving commission" objection. Only one construction project was described in evidence.

### 4. Closing Argument

■ The defendants make several claims of prejudicial error during closing argument. Particular complaint is made about the following passage during the plaintiff's rebuttal argument:

> MR. STRONG: That is just exactly the point I'm making. Mr. Oliver also said you will determine how much will be paid by the Defendants, and that is not true. *There is no evidence in this case that the Defendants will have to pay one penny of any judgment entered.* It's not for you to determine. (Emphasis supplied).

The defendants assert that this is a bald statement that their liability is covered by insurance. The plaintiff suggests that the argument is properly retaliatory.

The trial judge was not unmindful of the problems attending the argument. During voir dire Gascosage tried to prevent the plaintiff from asking the "insurance question," approved in numerous appellate decisions,[7] by submitting an affidavit that nobody connected with its insurer lived in Jasper County. The trial judge rejected this attempt because the submitted affidavit did not cover all possible situations, but instructed the plaintiff's counsel to ask the insurance question simply and inconspicuously. Counsel then asked a single question about jurors' affiliation with the insurance companies whose several policies provided the defendants' separate coverage. At that point the reasonably sophisticated jurors undoubtedly knew that there was insurance in the case, and they no doubt so advised their less perceptive colleagues.

Each defendant, during voir dire and the presentation of evidence, made mention of its modest position in the business world. Gascosage's counsel told the jurors that it had only 18 employees and no engineer. Tel–Elec was described as a family business.

At the beginning of final argument, plaintiff's counsel asked the court to instruct defense counsel not to mention the relatively small size of their clients. The court refused to give explicit direction, but cautioned counsel that argument about small size would invite retaliation. Defense counsel did not make a point of size, but counsel for Gascosage complained about "the kind of money" the jury was asked "to assess against my client" and pleaded for a "fair" verdict for the defendants, and counsel for Tel–Elec argued that the jury would have to decide "how much must be paid *by the defendants.*" The plaintiff cites these statements in asserting that he had a right to retaliate.

The trial judge overruled the objection to the argument now challenged. The plaintiff may have skated close to the edge, but we conclude that there was no abuse of discretion. We are more impressed with the plaintiff's suggestion that retaliation was in order than with the assertion that the argument did not directly mention insurance. But the incident was singular in a lengthy record and Tel–Elec had surely intimated that the defendants would have to pay whatever judgment the plaintiff

7. *Carothers v. Montgomery Ward & Co.,* 745 S.W.2d 170 (Mo.App.1987), reversing because the trial judge refused to allow the question; *George v. Howard Const. Co.,* 604 S.W.2d 685 (Mo.App.1980); *Bunch v. Crader,* 369 S.W.2d 768 (Mo.App.1963).

might recover. When there are co-defendants, counsel for one may sometimes open a door which permits the wind to blow on both. As has been said earlier, the presence of insurance was, no secret. This does not give the plaintiff license to flaunt insurance coverage in the jury's face, *Rytersky v. O'Brine*, 335 Mo. 22, 70 S.W.2d 538 (1934), often cited, but the trial judge apparently thought that brief retaliatory argument was in order on a matter as to which he had expressly cautioned the parties. With hindsight we might say that he could have avoided further trouble by sustaining the objection and directing the jury to disregard the argument, but he clearly believed that the defendants had not heeded his warning. We are unwilling to substitute our judgment for his studied conclusion. *Cf. Means v. Sears, Roebuck & Co.*, 550 S.W.2d 780, 787–88 (Mo. banc 1977).

■ Complaint is also made of plaintiff's saying to the jury that there was nothing in the instructions

> that says when you assess the total amount of damage to Brent Ballinger, you need to try to be fair to the defendants or anyone....

It is suggested that this is a misstatement of the law, and particularly that portion of MAI 4.01 which states that the jury must determine "such sum as will fairly and justly compensate plaintiff for any damages you believe he sustained."

> Counsel went on to say that it

> doesn't make any difference whether [the verdict] is fair or unfair to a defendant or a plaintiff. It's then the judge's job to enter a just judgment.

We do not believe that these passages, even with objection overruled, require reversal. The emphasis in the instruction is on fair and just compensation. It makes no difference who the parties are. When the defendants' counsel pleaded for fairness to their clients plaintiff's counsel took occasion to remind the jury that the instruction called for abstract fairness. We believe that the trial judge appropriately

refereed the fray and was not obliged to blow a faster whistle.

■ The other complaints about closing argument are not substantial. We do not believe that the plaintiff's suggestion that the judge would enter a proper judgment necessarily implied that remittitur might be available. There was an offset and the defendants had claimed contributory fault. The statement that the jury should not be concerned about the ultimate recovery or how it would be apportioned between the defendants is legally correct. The trial judge appropriately told counsel to let the matter drop. We also believe that the plaintiff's counsel's intimation that the plaintiff's wife might be upset if required to testify about her husband's agonizing injuries was an appropriate response to the defendants' assertion that an adverse inference could be drawn from the circumstance that she was not called to testify.

We do not accept the plaintiff's argument that the mention of insurance is prejudicial only if the size of the verdict is challenged. A jury may be more likely to find disputed liability against a defendant it believes to be insured.[8] But here the evidence of liability is strong and the damage award is not out of line, considering the severity of the injuries. These are circumstances to be considered in assessing prejudice.

### 5. Liability of Tel–Elec

As has been said, Tel–Elec sought to show that the workers' compensation statutes relieved it of liability to the plaintiff. The trial court held to the contrary, finding that Tel–Elec was jointly liable with Gascosage on the basis of *Boswell v. May Centers, Inc.*, 669 S.W.2d 585 (Mo.App. 1984). We now conclude that the summary judgment against Tel–Elec was improvidently entered and that there are issues requiring a trial. Although the plaintiff has assumed the burden of briefing the

---

8. *Langley v. Turner's Express*, 375 F.2d 296, 297 (4th Cir.1967), C. McCormick, McCormick on Evidence § 201 (3d ed.1984), Comment, *Mention of a Defendant's Liability Insurance in the Presence of a Jury*, 56 Neb.L.Rev. 153 (1977).

point, our disposition is such that the question of Tel–Elec's liability is now of interest only to the two defendants.

Tel–Elec argues that its undisputed showing in support of the motion for summary judgment demonstrates that it was engaged in a joint venture with Eazy, and that a joint venturer is entitled to the protection of the workers' compensation laws, § 287.120, RSMo 1986, when a tort claim is made against it by an employee of its coventurer. It falls back on the argument that its defense presents genuine issues of fact, so that the court erred in sustaining the plaintiff's motion for summary judgment.

It is agreed that the plaintiff was an employee of Eazy and not of Tel–Elec when he was injured. There was no showing of a written assignment or subcontract. Apparently Tel–Elec got the bid and Eazy proceeded to do the work. The affidavit of Earnest Hubnik, principal officer of both corporations, to which plaintiff filed no counter-affidavit, stated, among other things, the following: Tel–Elec was incorporated in Texas in 1978, under the name of Tel–Elect Company. The name of Tel–Elect Company was changed to Tel–Elec Company in 1979. Eazy was incorporated in Texas in 1979. At all relevant times Tel–Elec and Eazy "shared common officers, directors and shareholders, and performed power line construction work." The standard practice had been for Tel–Elec to make bids on its own behalf and on behalf of Eazy for certain projects having Eazy on the list of approved bidders. This practice was followed on the Iberia Rephase where the intention was for Eazy and Tel–Elec to perform all of the work on the project as partners in a joint venture.

The affidavit also stated: With regard to the Iberia Rephase, Tel–Elec and Eazy shared a common group of employees "and also shared equipment, resources, materials, funding, tools, payrolls, independent contractors, outside consultants, hiring and firing policies, project management and control, workers' compensation insurance coverage, banks, accounts payable, accounts receivable, profits and losses, employee handbooks and training manuals, and numerous other assets and resources." Work on the Iberia Rephase was performed by a group of employees common to Tel–Elec and Eazy. Employees were paid by checks issued on the accounts of Tel–Elec and Eazy, and Tel–Elec and Eazy considered themselves as one joint venture enterprise for all purposes involved in the performance of the Gascosage contract.

The affidavit continued: No contract or subcontract existed between Tel–Elec and Eazy involving the Iberia Rephase. At no time did either company delegate to the other any responsibility for any performance under the Gascosage contract. At no time did either company assign to the other any rights under the Gascosage contract. Neither company paid the other for any rights, responsibilities, privileges, or liabilities under the Gascosage contract. Tel–Elec did not pay Eazy and Eazy did not pay Tel–Elec for use of the other's employees, equipment, tools, supplies, liability or workers' compensation insurance during the performance of the Iberia Rephase. Management decisions for Tel–Elec and Eazy regarding the use of equipment, employment of personnel, and assignment of work crews to the Iberia Rephase were made as joint decisions by "essentially the same persons." During the Iberia Rephase Tel–Elec and Eazy were covered by a workers' compensation insurance policy issued by the same insurance carrier.

Tel–Elec's arguments must be considered against a background of principles which have been enunciated in Missouri cases and which the trial court should have in mind in resolving the factual and legal issues on remand.

Any rights which the plaintiff might have had at common law are supplanted and superseded by the workers' compensation act, if it applies. Whether or not the case comes within the provision of the act is a question of fact. *Jones v. Jay Truck Driver Training Center*, 709 S.W.2d 114, 115 (Mo. banc 1986). An injured plaintiff may file an action at common law. The defendant may assert by motion or answer that the court lacks jurisdiction of the sub-

ject matter because plaintiff was an employee when injured. Rule 55.27. The court may hear the matter in the manner permitted in Rule 55.28. If the court finds jurisdiction the parties may proceed to trial. If it finds no jurisdiction, the plaintiff may appeal. *Jones*, 709 S.W.2d at 116[1, 2]. Inasmuch as the workers' compensation proceeding had concluded before the jury trial was held, we do not have to decide whether any principle of prior resort to administrative remedies applies.

■ A final workers' compensation award determines the rights of the parties as effectually as a judgment. The award may be set aside or questioned only through the statutory review procedures. *State ex rel. Brewen–Clark Syrup Co. v. Missouri Workmen's Compensation Comm'n*, 320 Mo. 893, 8 S.W.2d 897, 900[8] (1928). An injured employee who has accepted benefits paid by his employer in compliance with the compensation act cannot maintain a tort action against his employer. This is so even though plaintiff had filed no compensation claim and the employer was neither insured nor qualified as a self-insurer under the compensation act. Plaintiff's retention of the compensation benefits constitutes an election precluding the maintenance of the "inconsistent" tort action. *Neff v. Baiotto Coal Co.*, 361 Mo. 304, 234 S.W.2d 578 (1950). An award of the Industrial Commission may be res judicata in a subsequent tort action between the parties. *Hines v. Continental Baking Co.*, 334 S.W.2d 140, 141[1] (Mo.App.1960). The employer-defendant has the burden of establishing the bar of the Workers' Compensation Act as an affirmative defense. *Id.* at 142–143. *See also Green v. Crunden Martin Mfg. Co.*, 575 S.W.2d 930, 932[3] (Mo.App.1978).

■ An unappealed final award of the Industrial Commission under the Workers'

Compensation Act, whether right or wrong on a fact issue within the jurisdiction of the commission, is as effective an adjudication of the rights of the parties as a judgment of a court and is impregnable to collateral attack. *Scannell v. Fulton Iron Works Co.*, 365 Mo. 889, 289 S.W.2d 122, 124 (1956). Collateral estoppel precludes the reexamination of previously litigated issues of fact or law, even if the prior judgment was erroneous. *Sunshine Realty Corp. v. Killian*, 702 S.W.2d 95, 99[2, 3] (Mo.App. 1985). Judgments, including judgments by agreement, are conclusive of matters adjudicated and are not subject to collateral attack except upon jurisdictional grounds. *Moore v. Beck*, 664 S.W.2d 15, 18 (Mo.App. 1984).

A joint venture is a species of partnership and is governed by the same legal rules. Both partnerships and joint ventures may be created informally.[9] A joint venture is said to differ from a partnership in that it is usually limited in scope. *Anderson v. Steurer*, 391 S.W.2d 839, 843[4] (Mo.1965). There a plaintiff brought a tort action against defendant Steurer. He had previously received workers' compensation benefits from his employer Stroup. If Stroup and Steurer were engaged in a joint venture, the plaintiff in legal effect was an employee of both and could not maintain the tort action against Steurer as a negligent third person. Liability would be under the Workers' Compensation Act exclusively. *Id.* at 843. *See also Rhodes v. Rogers*, 675 S.W.2d 107, 109 (Mo.App.1984), holding that a partnership employee who has received workers' compensation benefits may not maintain a negligence action against one of the partners on account of on-the-job injury; and *Bailey v. Morrison–Knudsen Co.*, 411 S.W.2d 178, 181 (Mo.1967), holding that an employee of a subcontractor may not receive common

9. *Sheridan v. McBaine*, 660 S.W.2d 188 (Mo. App.1983).

"A joint adventure is an association of persons to carry out a single business enterprise for profit, for which purpose they combine property, effort, skill and knowledge. The relationship arises only from contract, but the agreement may be established witout formal

terms, and implied from circumstances that such an enterprise was in fact entered into....

A joint adventure and partnership are kindred in characteristic and are governed by the same rules of law."

*Id.* at 194.

law damages from a principal contractor, for injuries covered by workers' compensation.

Plaintiff argues that, even if Tel–Elec and Eazy were engaged in a joint venture, a related corporation cannot avail itself of a sister corporation's workers' compensation immunity, citing *Boswell v. May Centers, Inc.*, 669 S.W.2d 585 (Mo.App.1984). There the plaintiff was an employee of May Department Stores, Inc., and he had filed and settled a workers' compensation claim against his employer. Centers filed a motion to dismiss on the ground that the compensation claim was plaintiff's exclusive remedy. Centers was a wholly owned subsidiary of May. The trial court sustained Centers' motion for summary judgment and plaintiff appealed.

The most obvious distinction between *Boswell* and the case at bar is that in *Boswell* the compensation claim was made against May and the tort action was brought against Centers. Here it may be argued that both the compensation claim and the instant tort action were brought against Tel–Elec.

There was no claim in *Boswell* that Centers and May were joint venturers or that plaintiff was injured during the course of a joint venture. May ran a department store and Centers operated a parking lot. The duty of maintaining the later was "solely that of [Centers]." Portions of the Hubnik affidavit indicate that such may not be the case here. The nature of the business conducted by May and by Centers was "distinct and unrelated." According to the affidavit, neither Tel–Elec nor Eazy was the wholly owned subsidiary of the other. The manner in which Eazy and Tel–Elec operated, specifically on the Iberia Rephase, may have been one of total integration. So *Boswell* is not necessarily in point.

There may be unintended consequences when people make informal use of the corporate forms or enter into contractual relationships without defining their arrangements with precision, but subcontracting arrangements are common, and there is nothing illegal or sinister about a joint venture. There is nothing in the instant, ad-

mittedly limited, record which demonstrates any policy reason why Tel–Elec and Eazy should not enjoy such immunity from tort liability as is appropriate to their legal arrangement, as it may further be defined by the circuit court.

The plaintiff argues that there is no evidence that "Tel–Electric, d/b/a Eazy Construction Co.," is the same entity as the defendant "Tel–Elec Company." In *Anderson v. Steurer*, the tort defendant was held to be entitled to immunity even though the compensation had been paid by the other joint venturer. The misnomer of a defendant in the first action does not prevent the judgment in that action from barring a second action between the same parties on the same claim. *Youngblood v. Grand Trunk Western Ry. Co.*, 239 Mich. 136, 214 N.W. 154, 155[2] (1927); 50 C.J.S. *Judgments* § 768, p. 298, n. 71. In *Youngblood* the court said: "Simply because the misnomer was waived by defendant, it does not follow that plaintiff can take advantage of his own error. The former judgment must be held to be res judicata of the present case."

Hubnik's affidavit shows that there is evidence from which the trial court could find that there was a joint venture between Eazy and Tel–Elec. A subcontracting arrangement might also be found. There is, additionally, evidence to support a finding that the plaintiff accepted workers' compensation benefits from Tel–Elec, confirmed by a final order of the Commission. It would be of interest to know whether the workers' compensation liability of Tel–Elec and Eazy was covered by the same policy and how they reported their income on federal and state tax returns.

But we are unable to hold on the record before us that the trial court erred in denying Tel–Elec's motion for summary judgment. Its brief concedes that this Court might properly feel that the materials before it, including the Hubnik affidavit, may contain too many gaps and conclusions to allow us to determine the issue without trial. Remand is appropriate to determine whether Tel–Elec and Eazy were engaged in a joint venture, whether Eazy was a

subcontractor of Tel–Elec, and whether the plaintiff accepted workers' compensation benefits from Tel–Elec. Any of these findings would preclude common law liability.

### 6. *Punitive Damages*

The plaintiff requested an instruction on punitive damages which the trial court refused. He appeals the refusal.

The requested instruction deviated from MAI 10.02, in hypothesizing facts in addition to those submitted in the verdict directing instruction. The defendants pounce because of the variance, asserting the familiar proposition that there is *no error in refusing a requested instruction which is not meticulously correct.*[10] The plaintiff counters with the suggestion that he did not believe that the bare facts hypothesized in the verdict director would justify a submission of "reckless and wanton conduct" such as is required when punitive damages are sought in a negligence case. He then asserts that there is no legal error in the requested instruction because he simply assumed an additional burden.

We do not have to decide whether the instruction is correct. Nor do we have to decide whether the facts would justify a punitive damage submission. We conclude that when a claimant seeks to impose vicarious liability through the use of the "inherently dangerous" doctrine, and when there is no viable claim that the defendants themselves were negligent,[11] punitive damages may not be recovered.

The plaintiff points to cases holding that punitive damages may be recovered when an employer is sued for the negligence of an employee[12] and when a partner is sued for the negligence of another partner.[13] We recognize these authorities, but distinguish the case before us. In the usual master-servant situation the imposition of vicarious liability serves two purposes. It places liability for causing harm on the person who stands to benefit from the commissioned activity and also provides motivation for careful supervision. The master has the right of control. The same principle could apply to partners, who have equal authority to direct the partnership business.

When an independent contractor is retained the right of control is lacking. So the imposition of vicarious liability serves the purpose of making a person who contracts for an inherently dangerous activity liable for the damage caused by the contractor's negligence in dealing with the inherent danger, but we perceive no desirable social purpose in requiring the person who retains an independent contractor to exercise continuing control. There is no claim here of negligence in the selection of the independent contractor, who, presumably, is more skilled than the owner in managing the details of the activity. Nor can it be said that the contracting for inherently dangerous activities is necessarily undesirable. Often, as here, the activity has a beneficial social purpose. In balancing the interests of the parties and the public we see no reason for imposing vicarious liability for inherently dangerous activities in excess of actual damages.

In *Philip Morris, Inc. v. Emerson*, 235 Va. 380, 368 S.E.2d 268, 283–84 (1988) the court held that the present and former owners of property, although liable for actual damages arising out of the storage of hazardous materials on the property, were not liable for punitive damages because the conduct of neither rose to the level of "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that

---

10. *American Family Mut. Ins. Co. v. Automobile Inter–Insurance Exch.,* 757 S.W.2d 304 (Mo.App. 1988).

11. The jury decided against the plaintiff on his claim that Gascosage was negligent.

12. *Melchior v. Madesco Inv. Corp.,* 622 S.W.2d 362 (Mo.App.1981); *Reel v. Consolidated Inv. Co.,* 236 S.W. 43 (Mo.1921).

13. The case cited, *Smith v. Courter,* 575 S.W.2d 199 (Mo.App.1978), treats of a partner's liability for the negligence of an employee of a partnership.

his conduct probably would cause injury to another." The reasoning of that case supports our holding.

There are several other claims of trial error which are so insubstantial that we do not need to prolong this opinion by discussing them.

### Conclusion

The judgment in favor of the plaintiff and against Gascosage is affirmed.

The judgment against Tel–Elec is reversed and the case is remanded for a trial of the question of Tel–Elec's liability.

RENDLEN, HIGGINS and COVINGTON, JJ., and SATZ, Special Judge, concur.

ROBERTSON and BILLINGS, JJ., concur in part and dissent in part in separate opinions filed.

HOLSTEIN, J., not sitting.

ROBERTSON, Judge, concurring in part and dissenting in part.

I concur in all but Section 4 of the majority opinion. In my view, plaintiff's counsel's closing argument was improper and the trial court's failure to take corrective steps constituted reversible error. In dissent, and with modification, I adopt portions of the well-reasoned opinion of the Court of Appeals, Southern District, relating to closing argument, without further attribution. The Honorable George M. Flanigan authored the opinion for a unanimous panel.

Gascosage's third and fourth points on appeal complain of certain portions of the final argument of plaintiff's counsel, Mr. Strong. Gascosage asserts that the challenged portions improperly suggested to the jury that Gascosage was insured, asked the jury to ignore fairness and justice in assessing damages, and improperly argued "concerning remittitur-additur."

At the instruction conference, Mr. Brown and Mr. Oliver, attorneys for Gascosage and Tel–Elec, respectively, announced they would not argue that the verdict should be tempered because Gascosage is a small co-op or Tel–Elec is a small, family-owned corporation. The trial judge indicated that he thought those arguments were improper, but if made, he would allow rebuttal retaliatory arguments on how the verdicts would be collected:

THE COURT: I indicated yesterday that, especially, uh, with Tel–Elec being owned by Mr. Hubnik and his wife, that I couldn't see how [the size of Gascosage] in any way could be proper argument, that it could only be for the reason of trying to get the jury to have sympathy and lower their verdict if they so find, or something of that type. And as I indicted yesterday, I'm not going to prohibit that argument, 'cause maybe there might be some way come up [sic] where it would be proper argument. But I also said that, that I would indicate—and I'm now so indicating—that if that argument is made, I will tell you right now I feel that *retaliatory argument of look, ladies and gentlemen, don't worry about how we collect this verdict, would be proper rebuttal retaliatory argument.* So, uh, you better do that at your own risk. One, you've got to find a way that it's proper to argue that, and, number two, you're opening yourself up to some argument that the Plaintiff couldn't otherwise make.

(Emphasis added.)

Responding to a question by Mr. Oliver on the scope of permissible argument, the judge added:

THE COURT: If you open up [the subject of family ownership of the corporation], Mr. Oliver, it's going to be opened up, and I'm going to let the Plaintiff stand up there—and I don't know whether they will or not, but that's a risk you're going to take—stand up there and say, "Ladies and gentlemen, it's not for you to worry about how these verdicts are correct, collected."

At the conclusion of the final argument of counsel for Tel–Elec, which was the last defense argument, the following occurred:

BY MR. STRONG: And if it please you, officers of the Court?

I have to admit I'm a little bit indignant about some of the things that have

been said, and we're going to start with this damage instruction.

(Mr. Strong displays instruction on overhead projector.)

This damage instruction says that, "You should determine the total amount of Plaintiff Brent Ballinger's damages to be such as will fairly and justly compensate Plaintiff Brent Ballinger." *There is nothing in this instruction, there is nothing in any instruction that* says when you assess the total amount of damages to Brent Ballinger, *you need to try to be fair to the Defendants or anyone.*

Remember the duties of the parties in this courtroom. The jury's job is to assess his total damages. Doesn't make any difference whether someone thinks it's fair or unfair to a Defendant or a Plaintiff. It's then the Judge's job to enter a just judgment, and it's the parties' job to live with it. Then—

MR. BROWN: Well, Your Honor, I object to that. It misstates the law.

THE COURT: Well, the—

MR. OLIVER: I join in that objection, also, Your Honor. It's clear that the standard is to fairly and justly compensate Mr. Ballinger. That's—

THE COURT: The objections will be overruled.

MR. STRONG: That is just exactly the point I'm making. Mr. Oliver also said you will determine how much will be paid by the Defendants, and that is not true. *There is no evidence in this case that the Defendants will have to pay one penny of any judgment entered.* It's not for you to determine.

(Emphasis added.)

At the ensuing bench conference, both defense counsel moved for a mistrial. Tel–Elec's counsel moved in the alternative that the jury be instructed to disregard "that statement by Mr. Strong." Tel–Elec's counsel also noted at that point that he had endeavored to steer clear of any argument giving the inference that Tel–Elec was a family-owned corporation to avoid opening up the subject.

The following then occurred at the bench conference:

THE COURT: All right. The request for mistrial is going to be denied. Now, however, though, we are [sic], don't go back to the additur-remittitur or calculations that you—stay, stay away from that from this point on. Do you understand what I'm saying? Don't, don't go back to, "The Court will enter a just verdict."

MR. STRONG: All right.

The court also denied the request that the jury be instructed to disregard the statement.

Immediately thereafter, the following then occurred before the jury:

MR. STRONG: *It is of no concern who will pay this judgment.*

MR. OLIVER: Your Honor—

MR. BROWN: That's just what we were talking about. I can't believe that.

MR. OLIVER: —may I approach the bench for a moment, please?

THE COURT: You may approach the bench.

Defense counsel renewed their request for mistrial and the alternative request for an instruction to disregard. Plaintiff's counsel did not offer any rationale for his argument and Mr. Brown again noted that neither defense counsel had remarked upon anything that would provoke the improper argument.

The colloquy at the bench included the following:

MR. BROWN: The, the confusion in this is something that Mr. Strong begins with himself, I think, and that is to say that the jury does not set the amount of damages in this case when we know they darn well do. The only thing the Judge makes is a—not to diminish your role in this—but is to make a, a pretty much ministerial calculation of, of what percentages apply to what number. You enter a judgment in the case which is a formal judgment, but you don't determine the amount of damages, the jury does.

THE COURT: Well, first, the rule, the request for a mistrial is going to again

be overruled, and Mr. Oliver, you must have misunderstood what I cautioned Mr. Strong about. I said stay away from, uh, an additur-remittitur type of argument and the Court entering a just verdict. I didn't say that he had to stay away from it's no concern who has to pay the judgment. Now, now that we've done this, let's don't spend the next hour on its no concern who. Let's move on to something else here pretty quickly.

"[T]he improper injection in a jury tried case that the defendant was covered by liability insurance constitutes error, especially so if thrown in purposefully or in bad faith." *Means v. Sears, Roebuck & Co.*, 550 S.W.2d 780, 787 (Mo. banc 1977). "[W]hen the trial judge is called upon to rule on the question, much must be left to his sound discretion, and only where there is a manifest abuse should we interfere." *Id.* at 788. Conduct of counsel in misstating the law "must always be condemned, whether due to inadvertence or to base motives. If the trial court overrules the objection, thereby condoning the misstatement, reversible error is almost inevitable." *Halford v. Yandell*, 558 S.W.2d 400, 411–412 (Mo.App.1977).

Counsel's statement that "there is no evidence in this case that the defendants will have to pay one penny of any judgment entered," coupled with his later statement that "it is of no concern who will pay this judgment," conveyed to the jury that the defendants were insured. Indeed, plaintiff's brief as respondent does not seek to place any other construction on the statements. Plaintiff seeks to justify those two statements by claiming they were retaliatory.

The record, including *voir dire*, on which plaintiff bases his retaliation argument, does not support plaintiff's position. Plaintiff emphasizes these portions of the final argument of Gascosage:

It's also hard to be sued, [Gascosage] to be sued under the circumstances of this case and to have somebody come in here and ask for the kind of money that Mr. Ballinger's lawyers are asking you to assess against my client on the basis of its involvement with or participation in or connection with, whatever it may be, in this case.... Why in the context of this case didn't somebody ask you to do what was just and fair among these parties based on what you've heard in this case and what's been proven to you about Mr. Ballinger's losses? Well, I'm asking you to do that. I'm asking you to follow the law that you said you could at the beginning of this case and to be fair to the parties to this case, and I mean all of them, all of them.... I'm certainly not going to tell you, that if you find that with respect to some conduct of Eazy's that, that you find was negligent and that was causative in, in causing Mr. Ballinger's injuries, that you shouldn't give him anything. He has those losses. But I want to ask you to exercise fairness and justice to the parties to this case.... It's easy for his lawyers to come in here and ask for a lot of money. I've looked at Mr. Ballinger. Do you believe, do you believe—and you've had a chance to see him—do you believe that Mr. Ballinger thinks he should walk out of this courthouse with the kind of wealth that Mr. Strong is talking about? Do you really believe that Mr. Ballinger thinks he's got that coming for what went on out there that day? Now I really don't believe he does, and I don't believe you believe that that's just or fair.... And if you think Mr. Ballinger had a percentage of fault in this case, then you put that down, and then you consider what's fair and reasonable with respect to damages to this case. And I'm sure you and your collective numbers will be, can be, we're confident that you will be fair and just to all of the parties in this case, including my client.... You've heard from me for the last time. But I'll ask you to make my answer, Mr. Hamilton's answer, and the, the Cooperative's answer for us and do justice to the parties in this case.

Although it was not necessary that he do so, plaintiff did not object to the foregoing argument when made nor does the foregoing argument contemplate the family ownership issue discussed at the instruc-

tion conference. Gascosage's argument simply does not justify the remarks contained in plaintiff's final argument.

Plaintiff also cites the following excerpts from Tel–Elec's final argument:

The other aspect of the case that's before you and which you will reach if you decide in the Plaintiff's favor on the issues of liability is the issue of damages; that is, did Brent Ballinger sustain damages as a result of the occurrence mentioned in the evidence? Now, the two areas of contention, of course, are liability; that is, do the Defendants have to pay, and is the Plaintiff—uh, excuse me, or—and the second aspect of the liability question is, is the Plaintiff at fault for the injuries that he suffered, or is he partially at fault? And on the verdict forms that I'll, I'll show you in a moment, you can assess a percentage of fault to the Plaintiff for the conduct if you find that he was at fault in part for the injuries that he suffered. On the question of damages, of course, that is, the bottom line in that regard is, if you find in the Plaintiff's favor on the question of liability, how much do the Defendants that are before you here today have to pay to compensate the Plaintiff for his injuries? And that is the word which you see on the instruction, to fairly and justly compensate Plaintiff for his injuries. . . .

There are some extremely vast sums that have been put up by Mr. Strong on the chart. . . . But that doesn't take you away from the fact that your duty as a juror is to provide justice for everyone who's here before you today, and that's Tel–Elec Company, and that's Gascosage Electric Cooperative, and that includes Mr. Ballinger. . . .

It says here that the, the Court will compute Plaintiff Brent Ballinger's recovery by reducing the amount that you find Plaintiff's total damage by any percentage of fault you assess to Brent Ballinger. So you are going to determine how much, what money if any that Brent Ballinger will recover in this case and what will be paid by the Defendants.

Nothing in the foregoing argument justified plaintiff's final argument, nor did plaintiff lodge an objection at the time the argument was made.

The damage instruction is based on MAI 37.03 [1986 New]. MAI 4.01 [1980 Rev.] also contains the language, "such sum as you believe will fairly and justly compensate plaintiff." It cannot reasonably be argued that the word "fairly" applies only to one side of the lawsuit. The sum awarded should be fair to both sides. Counsel's argument that there was nothing in the instruction "that says when you assess the total amount of damages to Brent Ballinger, you need to try to be fair to the defendants or anyone" is a misstatement of the law and an improper characterization of the word "fairly." That misstatement was not corrected by the trial court. Instead the court, in the presence of the jury, overruled the objection.

The error was compounded by counsel's statement that it "doesn't make any difference whether someone thinks [the jury's assessment of total damages] is fair or unfair to a defendant or a plaintiff. It's then the judge's job to enter a just judgment." Such an argument is an improper appeal to the jurors to fail to perform their own function in assessing the damages or at least conveyed to them the message that any unfairness in their assessment of damages would be corrected by the judge, who had a duty to enter a just judgment. The implication was that there was not duty upon them to arrive at a just verdict because any unfairness would be corrected by the court.

It is unnecessary to determine whether each of the foregoing errors, standing alone, would justify the grant of a new trial. In combination the errors required corrective action on the part of the trial court, either the declaration of a mistrial or at the very least an instruction to disregard them coupled with appropriate corrective remarks. This error is prejudicial; it entitles Gascosage to a new trial. In its separate appeal, Tel–Elec also objects to plaintiff's final argument and is entitled to the same relief.

Because the majority finds plaintiff's counsel's closing argument proper, I respectfully dissent from that portion of the majority opinion. For the reasons expressed, I would reverse the judgment of the trial court and remand for a new trial.

BILLINGS, Judge, concurring in part and dissenting in part.

I concur in the principal opinion except as to that part which holds punitive damages cannot be recovered in this case. The reasons expressed by the Chief Justice to support the award of actual damages would, in my view, adequately support submission and recovery of punitive damages. Accordingly, I concur in part and dissent in part.