

# Missouri Court of Appeals
## Southern District

### In Division

DANIEL WOODGATE and )
TANYA WOODGATE, )
            )
            Respondents, )
            )    No. SD37181
     vs. )
            )    **Filed:  September 30, 2022**
ST. JAMES WINERY, INC. and )
RAUL R. ESPINOZA, )
            )
            Appellants. )

APPEAL FROM THE CIRCUIT COURT OF PHELPS COUNTY

Honorable William E. Hickle, Judge

## AFFIRMED

Daniel and Tanya Woodgate were riding in a motorcycle convoy when Raul Espinoza, an employee working in the course and scope of his employment with St. James Winery, turned a company vehicle into the path of the convoy.  Mr. Woodgate suffered permanent, structural damage to his brain as a result of the motor vehicle accident.  After a hotly contested trial, a jury found in favor of the Woodgates, awarding them damages in the amount of $12.8 million after comparative fault offset.  Additional facts will be presented in the context of the point to which they relate.

Appellants allege error in the admission of certain evidence over their objection and in the denial of their request for mistrial. We affirm because Appellants have not met the high bar to show the circuit court abused its discretion.

**Admission of Expert Testimony**

The severity and extent of Mr. Woodgate's brain damage was an issue the parties knew would be contested at trial. Among others, the Woodgates designated as their expert Dr. O'Riordan, Mr. Woodgate's treating rehabilitation doctor in his home country of Australia. The Woodgates did not designate Dr. Huntley, Mr. Woodgate's treating neuropsychologist, also based in Australia. Appellants designated as their expert Dr. Fucetola, a neuropsychologist.

Appellants had difficulty getting data and test results transmitted from Dr. Huntley to Dr. Fucetola, who only received the information he needed a few weeks before the start of trial.[1] The trial court remarked, "[Dr.] Fucetola, it sounds like, got some data at the last minute that he needed in order to come up with his opinions . . . ."

During a discovery deposition the Friday before the selection of a jury on Monday, the Woodgates' attorneys learned, for the first time, that Dr. Fucetola used the recently-acquired data to generate an Intelligence Quotient Equivalent ("IQE") chart, which supported his opinion that Mr. Woodgate had made a significant recovery because his post-crash intelligence was within the range of average. The Woodgates' counsel was concerned because their anticipated expert testimony focused on Mr. Woodgate's cognitive and behavioral deficits, not his intelligence. The Woodgates' attorneys emailed Dr. Huntley to set up a time to discuss Dr. Fucetola's opinion.

---

[1] Both sides agreed, and represented to the court, that the raw data from Mr. Woodgate's tests could only be transmitted from one neuropsychologist to another directly. The court observed, "This is the weirdest thing that there is this secret information that's going from expert to expert that nobody else gets to see."

Dr. Huntley was not available to speak with the Woodgates' attorneys until a week later. The Woodgates' attorneys represented to the court that Dr. Huntley said the data was accurate but the IQE chart was misleading. At that point, both parties had given opening statements and the jury had heard three days of testimony from the Woodgates' witnesses. That Saturday, the Woodgates filed a notice of their intent to present expert testimony from Dr. Huntley.

The circuit court initially was reluctant to grant the untimely expert designation and permit Dr. Huntley to testify. After extensive oral argument, the court was persuaded that the IQE issue did not arise until the Friday before trial began on Monday, and the Woodgates' counsel did not know he had a witness who could rebut Dr. Fucetola's IQE chart until a week after counsel first became aware of the issue.[2] At that point, the court was inclined to permit Dr. Huntley to testify as an expert but only as to the very limited issue of the IQE:

> Well, I'm not opening the door for you to use Dr. Huntley as a general expert to rebut everything that Dr. Fucetola was going to say. You've had -- you've had your expert testimony describing the cognitive deficits that your client has suffered. And to the extent that Dr. Fucetola generally rebuts that, you've had your opportunity to show that portion of the case.
> The surprise to you, that you've just found the answer to on Friday, has to do with the . . . IQE. That's what he gets to talk about.
> Everything else -- we've had Dr. O'Riordan. She testified for hours. And so to the extent that Dr. Fucetola is going to say, hey, he's got some neuropsychological or cognitive deficits but they're not really that awful serious, you've had your shot at explaining to the jury that he actually has serious cognitive deficits.
> The one thing that is a surprise to you is that all of a sudden there is this IQE. And so you get to rebut that with Dr. Huntley.
> ***
> And I can tell you right now, to the best of my ability, I'm going to keep the scope of this testimony very narrow. I don't think once you get to the deposition to preserve testimony it's going to be a very long deposition.

---

[2] The Woodgates' attorneys were directed to turn over all their communications with Dr. Huntley to substantiate their assertions of the contact timeline.

There's just not going to be very much that your witness is going to be allowed to talk about.

The trial could not proceed until this issue was resolved, so the jury was dismissed for the day. Discovery and preservation depositions of Dr. Huntley were taken that afternoon, with the court available to resolve disputes. [3]

After reviewing the deposition transcripts, the court observed, "The gist of the deposition testimony of Dr. Huntley, as redacted, is that here's an IQE chart. The IQE chart does not tell the whole picture."

Both sides were given the opportunity to be heard once again before the court made its ruling:

> Now, the reason that I'm going to be willing to allow [Dr. Huntley's testimony] is because the word IQE did not enter the lexicon in this case, as I understand it, by any counsel, defense or plaintiff, until the Friday before this trial began. Now, neuropsychologists [k]new all about it. But that doesn't mean counsel knows about it.
> And so plaintiff's counsel learned about the whole concept of an IQE, basically, one business day before trial. They tried to get ahold of Dr. Huntley, it took a few days to do it. Dr. Huntley said, well, that's misleading to use that by itself.
> ***
> And there's a lot of other things that Dr. Huntley would like to address that he is not being allowed to address. He's done some tests, would like to just generally contradict the testimony of Dr. Fucetola. And that's not being allowed. The only thing that's being allowed is the one narrow issue of the IQE that all counsel just learned about right before trial started.
> That's the order of the Court.

The Woodgates played the video deposition of Dr. Huntley during their case-in-chief. A video of Dr. Fucetola's deposition was played for the jury during Appellants' case-in-chief. The Woodgates presented no rebuttal evidence.

---

[3] We commend counsel and the court for their flexibility and determination to resolve this issue so the trial could proceed with only a one-day interruption.

4

On appeal, Appellants first claim Dr. Huntley's testimony was not proper rebuttal and permitted the Woodgates to have the last witness and the last word on the issue. This argument is a *non sequitur* because Dr. Huntley's video deposition was played during the Woodgates' case-in-chief, not as a rebuttal to evidence offered in Appellants' case-in-chief.

Appellants next argue they were prejudiced by the late designation of Dr. Huntley. Prejudice is a necessary showing for Appellants to prevail on appeal. ***Linton by & through Linton v. Carter***, 634 S.W.3d 623, 627 (Mo. banc 2021) (judgment will not be reversed for erroneous ruling on evidence unless the error materially affected the merits of the action). But Appellants *also* must demonstrate the court's ruling was an abuse of discretion:

> This Court reviews a circuit court's decision to admit or exclude expert testimony for an abuse of discretion. A circuit court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.

***Id.*** at 626–27 (internal citation and punctuation omitted).

Appellants failed to meet this burden. The record shows that the court took great pains to sort through an issue the Woodgates' counsel could not have discovered until one business day prior to the start of trial. The parties were given ample opportunity to be heard on this issue over two days of trial. The court recessed the jury so the parties could depose Dr. Huntley. The court deliberately limited Dr. Huntley's testimony to the IQE issue only and the video deposition was redacted accordingly. When the video was played to the jury, they heard not only the examination of Dr. Huntley by the Woodgates' attorneys, but also cross-examination by Appellants' attorneys. All of this indicates

thoughtful reflection on a fair resolution of the issue, not arbitrariness or a lack of careful, deliberate consideration.  Point denied.

## Denial of Request for Mistrial

From *voir dire* through summation, skilled trial counsel on both sides attempted to highlight certain factors.  Appellants reiterated time and again that St. James Winery was a family-owned business that employed many local people.  The Woodgates made it well-known they were seeking tens of millions of dollars, the largest damage award in the history of Phelps county, a "verdict for all time".

During Appellants' summation, the following exchange occurred:

**[Appellants' counsel]**:  The bottom line is this, though, you are now being asked, if I heard and I saw the numbers correctly, to render a judgment against St. James Winery, a company that this man's family built for 50 years of over $20 million –

**[Woodgates' counsel]**:  Judge, I am going to object.  This is like the fifth time.  There is no evidence that St. James Winery will pay one cent for any judgment.

Appellants moved for a mistrial, which was denied.  At the request of Appellants' counsel, the jury was instructed to disregard the comment by the Woodgates' counsel.

Appellants cite, among many other cases, **Collier v. Steinbach**, 597 S.W.3d 317, 320 (Mo.App. 2019), in which our Eastern District correctly observed, "It has long been generally considered reversible error in personal injury actions to show, directly or indirectly, that the defendant carries liability insurance."  Appellants argue there was no justification or basis for the Woodgates' counsel to say what he did, and no instruction from the trial court could cure the prejudice to Appellants.

"[M]istrial is a drastic remedy and the decision to grant or deny such relief lies in the sound discretion of the trial court.  Absent a manifest abuse of discretion, an appellate

6

court will not interfere with the trial court's decision." ***Spence v. BNSF Ry. Co.***, 547 S.W.3d 769, 780 (Mo. banc 2018) (internal citation and punctuation omitted). These same principles apply in personal injury cases when insurance is mentioned:

> [N]ot every reference to insurance constitutes reversible error or requires the discharge of a jury. The trial judge is in a much better position than the appellate court to determine whether a reference to insurance was motivated by good or bad faith. The trial court also is better able to judge the effect on the jury. For these reasons, the decision of whether to grant a mistrial when such a situation arises is one that is left to the sound discretion of the trial court, and only where a manifest abuse of discretion occurs will the appellate court disturb this decision.

***Taylor v. Republic Auto. Parts, Inc.***, 950 S.W.2d 318, 321 (Mo.App. 1997) (internal citations and punctuation omitted).

We are not persuaded that a manifest abuse of discretion occurred in this case. The brief objection by the Woodgates' counsel did not "inject" the issue into the case for the first time or add anything the jurors did not already know. During *voir dire*, the Woodgates' attorney told the venire panel, "And there will be, you know, no evidence presented to you about, you know, anyone losing their company." In the presence of other panelists, venire persons said:

- "I worked in, you know, buying insurance for companies in the past, so I was in charge of insurance. So we bought liability insurance, right? We protected our employees. And that's part of what you do as an owner. So that's their responsibility."

- "And I'm sure they're insured out the wazoo for as big of an operation as they have."

- "I know they're not going to close down."

During opening statements, Appellants' counsel said, "So let's hear the entire story about damages and who they are going to have testify as to these outrageous numbers that they want the winery to pay for in a judgment." The Woodgates' counsel objected: "I would

7

object to that. There is no evidence that the winery is paying for any of this." None of these references to or intimation of liability insurance were objected to on that basis by Appellants' counsel.

The strategic framing by the parties and the objectionable language during closing in this case are remarkably similar to the circumstances in ***Ballinger v. Gascosage Elec. Co-op.***, 788 S.W.2d 506, 512-13 (Mo. banc 1990) (overruled as to a different point of law). There, as here, the companies involved cast themselves as a small business or family business, with their counsel complaining about the amount of damages plaintiff was seeking. In summation, plaintiff's counsel said, "[Defense counsel] also said you will determine how much will be paid by the defendants, and that is not true. *There is no evidence in this case that the Defendants will have to pay one penny of any judgment entered*." ***Id.*** at 512 (emphasis in original). As could be said in this case, "the presence of insurance was no secret." ***Id.*** at 513. Although a party may not flaunt insurance coverage in the jury's face, a brief, retaliatory argument is not necessarily out of order. ***Id.***

The circuit court did not abuse its discretion in overruling Appellants' request for a mistrial. Point denied. Judgment affirmed.

JACK A. L. GOODMAN, C.J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

DON E. BURRELL, J. – CONCURS